**Seldon DAVIDSON, Plaintiff-Appellee,**

**v.**

**John W. GARDNER, Secretary of Health, Education and Welfare, Defendant-Appellant.**

**No. 16541.**

United States Court of Appeals
Sixth Circuit.

Dec. 28, 1966.

As Amended March 7, 1967.

Robert C. McDiarmid, Atty., Dept. of Justice, Washington, D. C., for appellant, John W. Douglas, Asst. Atty. Gen., Alan S. Rosenthal, Atty., Dept. of Justice, Washington, D. C., George I. Cline, U. S. Atty., Lexington, Ky., on brief.

Charles M. Tackett, Lexington, Ky., for appellee, Lester H. Burns, Jr., Manchester, Ky., on brief.

Before O'SULLIVAN and PHILLIPS, Circuit Judges, and McALLISTER, Senior Circuit Judge.

McALLISTER, Senior Circuit Judge.

Some explanation is called for when an opinion in a Social Security disability benefit case is as extensive as this opinion, and where, in effect, it stands as the single opinion of one judge out of three, the other two members of the court concurring merely in the result. The main task of the writer of this opinion, it should be frankly said, was to emphasize to the other members of the court that the judgment of the district court should be affirmed. A large portion of the opinion was written to discuss and pass upon a number of able and forceful arguments advanced by counsel for appellant, any one of which, if sustained, would result in reversal. Those arguments, it seemed, were required to be discussed and answered in justice to appellant's counsel. The balance of the opinion is directed to affirmance of the judgment of the district court, based on the unanimous opinions in adjudications of this court and other courts in similar cases, concerning which there is, apparently, no disposition to overrule. Under the circumstances above mentioned, it seemed proper to stress these grounds for our determination.

Appellant Secretary of Health, Education and Welfare seeks review of the order of the district court reversing the decision of the Secretary denying the claim of appellee for disability benefits, and remanding the case for an order granting a period of disability and disability insurance benefits.

Appellee Mr. Davidson is thirty-eight years old. On December 16, 1960, he filed his application for disability benefits. At that time he was thirty-two years old and he claimed that, because of a ruptured disc in his spine, he had become unable to work as the result of an impairment suffered by him on February 15, 1956. In his application, he further showed that he had previously worked only as a manual laborer, and had a sixth-grade education.

There is no question in this case that there is something seriously wrong with appellee. That is agreed to by the Government itself; and it agrees that his condition is such that he can no longer return to the work he has always performed. The question is: What is the matter with him—a question concerning which the Government officials, the Hearing Examiner in two hearings, the Appeals Council, and the witnesses are, in some instances, uncertain. Most of them say he is completely disabled; oth-

ers consider he should have a surgical operation to see whether there is a possibility that he can be rehabilitated for the labor he has previously performed; and one, who saw appellee only on a single occasion, gives it as his opinion that appellee should undergo psychotherapy and perhaps, vocational rehabilitation in the form of physical therapy, to regain confidence in himself. But they all agree that he can no longer do the only kind of work he ever did in the past.

There were two hearings in this case. After the first decision of the Hearing Examiner, an action was commenced by Mr. Davidson in the district court, which remanded the case for further evidence and findings. After the second hearing, another action was commenced by Mr. Davidson in the district court, which reversed the decision of the Secretary and remanded for entry of an order granting disability benefits.

We shall, hereafter, review in full, the evidence and the merits of this controversy.

To commence our discussion of the case, however, we point out again as we have in so many of these cases in the past, that the Secretary was plainly guilty of reversible error in a number of instances, at the expense and to the disadvantage of appellee, a poor man, and a man admittedly disabled from performing, at that time or in the future, any manual labor which was the only kind of work he had ever done.

First, the Hearing Examiner held that: "Ordinarily, the language of a remedial statute like the Social Security Act is construed *liberally*. However, this is a rule of statutory construction to be applied where the intent of Congress is not clear. * * * Insofar as the disability provisions of the Act are concerned, Congress has made it abundantly clear that it intended the statute to be construed *literally*," or that there should be a strict construction as far as the disability provisions are concerned. (Emphasis supplied.) Further, the Hearing Examiner held that *"Congress expressly rejected a liberal construction of the disability provisions*—a fact recognized by many of the courts." (Emphasis supplied.) This is completely erroneous.

In Polly v. Gardner, Secretary, 364 F.2d 969, 974 (C.A.6), in reversing a judgment in favor of the Secretary, this court held:

"In this case, the objective of the Secretary appears to be to secure a strict, as opposed to a liberal, construction of the Social Security Act with regard to disability benefits. In fact, in his decision, the Hearing Examiner stated that 'we conclude that Congress intended a strict construction of the disability provisions of the act.' This is contrary to our view that the statute should be liberally construed in favor of disability; and this view is supported by numerous authorities.

"In Drafts v. Celebrezze, 240 F.Supp. 535, 538 (D.C.E.D.S.C.1965), Judge Hemphill, in reversing the decision of the Secretary and entering a judgment in favor of the applicant, said:

" 'The major thrust of the rationale of the Hearing Examiner's conclusion is that:

" 'it is quite clear from the medical evidence that the claimant does have arthritis of the spine and that it is accompanied by pain and discomfort. From the claimant's testimony it is also clear that he requires home therapy in the form of spinal traction. The existence of an impairment in itself is not sufficient to entitle a person to benefits under the Social Security Law. * * *

" 'The Hearing Examiner recognizes that the nature of the claimant's impairment may possibly preclude him from doing the strenuous type of work required of him as an employee at the quarry, but this does not establish inability to engage in *any* substantial gainful activity as required by the definition of disability contained in sections 216(i) and 223 of the Act.'

" 'The Hearing Examiner is correct, but he has taken a very restrict-

ed view of the term "any", to the point where it appears, from reading the record as a whole that he has considered the employability of the plaintiff as "conceivable" as opposed to being "reasonable" under all the circumstances. Note Hill v. Celebrezze, 233 F.Supp. 298 (E.D.S.C. 1964). *The broad purposes of the Act require a liberal construction in favor of disability* if same is reasonably made out. Bagwell v. Celebrezze, 232 F.Supp. 989 (W.D.S.C. 1964). The intent is inclusion rather than exclusion. Miles v. Celebrezze, 233 F.Supp. 767, 770–771 (W.D.S.C.1964).' (Emphasis supplied.)"

"In Smith v. Gardner, 251 F.Supp. 262, 268 (M.D.N.C.1966), Judge Gordon, in reversing the decision of the Secretary and remanding the case with directions to grant disability benefits, said:

" 'Thus, the medical evidence, the subjective evidence of disability, the corroborating evidence of the plaintiff's spouse, the work history of the plaintiff, and the evidence furnished by her employer all show *nemine contradicente* that the plaintiff is unable to engage in a substantial gainful activity. Considering the evidence whereon it would have been possible for the Hearing Examiner to have based his decision—there is none.

" 'Although the courts are not to interpret the Social Security Act so broadly as to equate it with unemployment compensation, Celebrezze v. Sutton, 8 Cir., 338 F.2d 417, 422 (1964); Richard v. Celebrezze, 247 F.Supp. 183, 185 (D.Minn.1965), *the Act is nevertheless to be construed liberally*, Bradey v. Ribicoff, 4 Cir., 298 F.2d 855 (1962), cert. den. 370 U.S. 951, 82 S.Ct. 1601, 8 L.Ed.2d 817 (1962), cert. den. sub nom. Heath et al. v. Celebrezze, 372 U.S. 945, 83 S.Ct. 938, 9 L.Ed.2d 970 (1963); Celebrezze v. Bolas, 8 Cir., 316 F.2d 498, 500 (1963); Rodri-

guez v. Celebrezze, 1 Cir., 349 F.2d 494; DeGracia v. Secretary of Health, Education and Welfare, 248 F.Supp. 522 (D.P.R.1966).' (Emphasis supplied.)"

■ It was reversible error for the Secretary to hold that the disability provisions were to be strictly construed to deny disability, rather than to be given a liberal construction in favor of disability.

■■ The Secretary further committed reversible error when he held that the claimant had failed to show by competent medical evidence, coupled with *objective findings* that he was suffering from an impairment or combination of impairments of such severity so as to preclude claimant from engaging in any substantial gainful activity. The Hearing Examiner stated: "There is no great *objective* evidence of the disease * * *. From [January 18, 1956] until January 23, 1963, it was thought by various physicians that he might have suffered a ruptured intervertebral disc in his lumbar spine. However, there was never any objective evidence of such a diagnosis, the X-rays never proving such a diagnosis. * * * Objectivity in medical reports is required by the regulations of the Social Security Administration. 20 CFR 404.1510." The foregoing regulation states that an alleged impairment is medically determinable only if it can be verified by the use of *clinical* and laboratory diagnostic techniques. This, the Hearing Examiner concludes, means that there must be *objective* evidence of the impairment. If this is so, it is contrary to what this court and all the courts have held in this regard, and we will not follow the rule that impairments, in order to be medically determinable, must be verified *by clinical and laboratory diagnostic techniques*. Further, the Hearing Examiner held:

"The hearing examiner has carefully considered the opinions of various physicians, *which were not based on objective clinical findings*, that claimant was totally disabled and unable to pursue gainful employment on the ba-

sis of his physical condition. While such opinions are evidentiary, it is manifest under the Act and the regulations promulgated thereunder that such conclusions upon the ultimate issue to be decided by the Secretary of Health, Education, and Welfare, shall not be considered to be determinative of the question as to whether claimant is under a 'disability.' *The weight to be accorded such opinions is dependent upon the extent the opinions are supported by clinical and laboratory diagnostic techniques."* (Emphasis supplied.)

In Ross v. Gardner, Secretary, 365 F.2d 554 (C.A.6), in reversing a judgment in favor of the Secretary, this court said:

"Obviously, the Hearing Examiner in this case, as in other cases coming to our attention, assumed that 'medically determinable' means 'supported by objective clinical findings and reports.' The Act means nothing of the kind.

"Mental impairment alone may result in disability entitling the one suffering therefrom to disability benefits under the Social Security Act. Such impairment may be medically determinable but, in few cases, could a conclusion of such impairment be supported by objective clinical findings. See Hill v. Celebrezze, 233 F.Supp. 298 (D.C.E.D.S.C.).

"Pain, unaccompanied by any objectively observable symptoms, may be so real and so intense as to be disabling, and will support a claim for disability benefits. Ber v. Celebrezze, 332 F.2d 293 (C.A.2). The fact that there is such a subjective symptom as pain of claimant for social security benefits does not mean that it ranks as a lesser type of disability. Blanscet v. Ribicoff, 201 F.Supp. 257 (D.C.Ark.).

"There is no requirement that a physician's evidence or testimony must be supported by objective clinical findings. Page v. Celebrezze, 311 F.Supp. 757 (C.A.5); Lightcap v. Celebrezze, 214 F.Supp. 209 (D.C.Pa.).

"It was error on the part of the Hearing Examiner to hold, in this case, that the physician's opinions or conclusions must be supported by adequate objective clinical findings."

Moreover, the Hearing Examiner held that, although the appellee "may suffer pain while engaging in physical activities, it should be pointed out that many people engage in physical work, as well as in many trades, businesses, and professions, *while suffering more or less constant pain."* (Emphasis supplied.)

We know of no cases that hold that a man suffering from constant pain is obliged to engage in substantial gainful activity, or be deprived of disability benefits under the Social Security Act. The Hearing Examiner further held: "Pain, if severe, causes impairment of motion and strength, *but cannot be considered as a disability or end result in itself."* (Emphasis supplied.) This is error. "There is nothing in the statute or the legislative history which indicates a Congressional intent to exclude disability caused by pain, as contrasted to other types of disability, such as disability resulting from loss of limbs or sight or from mechanical disfunction of limbs, joints, or other organs of the body. As a matter of fact, common experience and observation teach that in many cases of disability, pain in one form or another is the chief and immediate disabling agent. An individual's body may be mechanically capable of use and function, but the pain resulting therefrom may be so great as to preclude them." Lewis v. Flemming, 176 F.Supp. 872, 876 (E.D.Ark.E.D.).

In Drafts v. Celebrezze, 240 F.Supp. 535, 538 (E.D.S.C.), the court said:

"Pain was brushed aside as a subjective non-entity. Well reasoned opinions and the obvious purposes of the Act compel that great consideration be accorded to that merciless entity called 'pain'. The fact that some extraordinary individuals can bear it and perform unflinchingly does not mean that such heroics is the 'standard'. The criterion is not even the standard of the

ordinary man or the average man; the standard is the individual claimant himself, with all his personal assets and liabilities."

In Butler v. Flemming, 288 F.2d 591, 595 (C.A.5), the court held:

"Perhaps it is true that history teaches that 'A man may have to endure discomfort or pain and not be totally disabled; much of the best work of life goes on under such disabilities * * *.' But the purpose of much social security legislation is to ameliorate some of these rigors that life imposes. Congress has in effect stated that if a person is unable except under great pain to engage in any substantial gainful activity in which he might be employable, taking into consideration his age, training, work experience and physical and mental capacities, he shall be deemed to be disabled for the purposes of this Act."

■ A man suffering constant pain, resulting from an injury, is not required to engage in substantial gainful labor in order to be entitled to the disability benefits provided by the Social Security Act.

■ Accordingly, we are of the view that the Hearing Examiner and the Secretary were guilty of reversible error in holding that a man suffering constant pain is obliged to engage in substantial gainful employment, or be precluded from the benefits provided by statute.

Although the foregoing errors on the part of the Secretary in arriving at his determination are sufficient to reverse the case, we are of the view that a complete consideration of the pertinent evidence is proper for disposition.

We shall first discuss the testimony and evidence of appellee as to his injury, disability, and the pain which he suffers, and, afterward, set forth all of the medical evidence in the case, the overwhelming weight of which, in our opinion, supports appellee's contention that he is disabled from any substantial gainful employment and is entitled to the allowance of disability benefits under the Act.

As above recounted, appellee received the injuries resulting in his disability on February 15, 1956. He last met the earnings requirements under the Social Security Act on December 31, 1958.

We commence, then, with appellee's own testimony and evidence as to his injuries, pain, and disability, which is supported by those who best knew him.

As appears from the evidence, after appellee was injured, he stayed in bed a few weeks until he was advised by his doctor that he could try to return to work about a month or so afterward, and thereafter he did try to work for a short time. However, he stated that he experienced such pain that he was unable to continue any work whatever. In appellee's testimony in the two hearings before the Hearing Examiner, he stated that at the time of the first hearing, he was suffering pain in his lower back and in his left leg; that it was a dull aching pain at all times, and that when he was in a certain position, it became a sharp pain running down from his back to his left leg; that he had to be very careful when he walked, "to walk straight and even;" that his left leg was weak and that up a bank or slope it barely carried the weight of his body; that he walks a distance of perhaps only a total of a mile during a week; that he also had a great deal of trouble with his neck; that "it hurts all the time, and especially if I hold my arm up or try to hold anything in it;" that some doctor said it was arthritis, and another doctor told him he thought "it was a disc there;" that he had consulted numerous doctors, one of whom said that he might have to have surgery. Appellee repeatedly testified that he had never refused to submit to surgery except when he first saw Dr. Lynch, the company doctor of the corporation in whose employ appellee was injured, in 1956, immediately after the accident, when he was going back home to Kentucky, although Dr. Lynch's report of that meeting with appellee, referred to by the Hearing Examiner, was not made until 1961. At the time of appellee's injury,

Dr. Lynch had given him some injections and some medication. As of 1956, Dr. Lynch had reported that appellee was suffering from herniation of intervertebral disc at lumbosacral level of the left side. Appellee stated that none of the many doctors who had seen him and who had examined him ever instructed him to have surgery for his condition; and that he would undergo it whenever they thought it was proper. In September 1961, he was hospitalized for five days with his back in traction. Appellee's testimony was supported by that of his wife, as well as by Mrs. Mary M. Hoskins, her sister, and by Mr. Grover C. Hoskins, his brother-in-law.

We shall here discuss the first hearing before the Hearing Examiner, in which the appellee and several other witnesses appeared.

The Hearing Examiner found that Mr. Davidson had a herniated intervertebral disc in the L–5, S–1 interspace, or lumbosacral interspace. He, however, found that Mr. Davidson was not disabled from all substantial employment, although he was disabled from work requiring bending, stooping, or any strenuous effort, or from manual labor, which was the only type of work he had ever performed. He further recited that, from the evidence, Mr. Davidson was able to stand for about three-quarters of an hour and to sit for a considerably longer period, although he became restless after half an hour. He also went on to mention a number of other activities of Mr. Davidson which had no bearing upon his disability, such as taking trips in automobiles—driving part of the way, shaving, dressing, bathing, and tying his shoes most of the time, as well as reading his Bible constantly, even in bed, driving his family one mile to church, and acting as an unpaid preacher there. The Hearing Examiner emphasized that, while Mr. Davidson might suffer pain while engaging in physical activities, many people engage in physical work as well as in many trades, businesses and professions while suffering more or less constant pain. In his findings, the Hearing Examiner stated: "On February 15, 1956, while working for the Tennessee Corporation at Cincinnati, Ohio, he was balancing and rolling a two-wheel handcart loaded with 800 pounds of fertilizer which became over-balanced, whereupon in the ensuing accident his lower back was injured. Later, in the latter part of 1959 while working at a lumber mill in Indiana and holding on to a hook as a log was being turned, he received a jerk in the left arm. Since that time he has suffered pain in the neck area with the pain radiating into the arm and forearm. In the first part of 1960 he endeavored to work at the Farm Bureau's fertilizer plant in Jeffersonville, Indiana, but was forced to stop after a few days because of pain in his back."

The Hearing Examiner found that while Mr. Davidson could not perform the labor which he had always been engaged in, he could engage in a lighter kind of work of a substantial gainful nature; and he, therefore, denied Mr. Davidson's application for disability benefits.

Appellee then filed an action in the district court seeking to have the decision against him reversed and set aside, and disability benefits allowed him. The Hearing Examiner had found that, while Mr. Davidson was no longer able to engage in his previous work of manual labor, he could engage in lighter work of a substantial gainful nature; but the Hearing Examiner did not indicate what kind of light work he could perform. Accordingly, the district court, following a long line of decisions including those of our court, required the Secretary to specify what light work an applicant, so disabled, could perform, and remanded the case to the Secretary in order that further evidence could be taken and findings made on the issues set forth in the court's order, which were:

1. What can the applicant do?

2. What substantial gainful employment opportunities are available for the applicant in the light of his physical and mental condition, and his education, training, and experience?

3. Is applicant's impairment remediable?

Upon remand, another hearing was held before the same Hearing Examiner.

In addition to considering the testimony and evidence of nine physicians and surgeons taken on the first hearing, the Hearing Examiner secured additional evidence from nine of these witnesses, and took the evidence of five more, making a total of fourteen physicians and surgeons. He also heard further testimony from Mr. Davidson and his wife.

After the hearing, the Hearing Examiner filed a closely fine-typed opinion of twenty-five pages in which he again denied Mr. Davidson disability benefits on the ground that he had not suffered such impairments as would preclude him from engaging in substantial gainful employment. He made no findings as to whether the impairments were remediable. He did, however, hold that Mr. Davidson. because of his injuries, could not return to his former work or any work requiring any lifting, bending, stooping, strenuous effort, or manual labor; but he found that there were many jobs, described by a witness, Dr. Auvenshine, a vocational counselor, as light work which Mr. Davidson could perform.

After the second decision by the Hearing Examiner, Mr. Davidson appealed; and the Appeals Council found that Mr. Davidson could not engage in any arduous or strenuous physical activity or work requiring heavy lifting or constant stooping or bending—"including the restrictive effect imposed by the impaired cervical disc"; and the Council in its decision stated that appellee's condition was not "in the opinion of some examining physicians of the level of severity to prevent the performance of light work." It stated further that it believed, "and so finds, that the claimant's condition is amenable to surgery which, if performed, would alleviate his symptoms and result in a further increase in his ability to function and engage in occupations which may now be beyond his capacity. In conclusion, the Appeals Council found that appellee had not established that he suf-fered from an irremediable impairment and, therefore, his condition cannot be said to be of long-continued and indefinite duration as required by section 223 of the Social Security Act." It appears upon examination of the decision of the Appeals Council that it really considered that appellee could not perform substantial gainful employment, but that the condition was remediable. Nevertheless, it agreed with the Hearing Examiner that appellee could perform substantial gainful activity of a light nature, which conclusion would make all of its discussion of the remediable nature of appellee's injury seem to be confusing surplusage. If the Appeals Council really believed that Mr. Davidson could engage in substantial gainful activity of a light nature, there was no reason for its extended discussion of the surgical aspect of the case with regard to restoring him to strenuous and arduous physical activity.

The Appeals Council was not sure what caused appellee's impairment, but held that "although it is not absolutely certain that the claimant has a lumbar disc protrusion, surgical intervention would correct this condition if confirmed." (Emphasis supplied.) There was expert evidence also that appellee might require a spinal fusion. Everyone knows that a surgical operation to correct a lumbar disc protrusion, or for a spinal fusion, is a serious and painful and, often, a dangerous operation. If appellee did not have a lumbar disc protrusion, implicitly surgery would not be necessary, and would not correct his impairment. Not knowing whether he had a lumbar disc protrusion or not, the Appeals Council decided to deny appellee disability benefits, if he did not undergo a serious operation for an impairment that he may not have been suffering from at all, on the ground that regardless of the cause of his impairment, he should submit to an operation for an ailment they guessed that he might have.

Thus, while the Hearing Examiner found that appellee did not suffer from an impairment that would prevent him

from engaging in substantial gainful employment, the Appeals Council did not find that appellee could engage in substantial gainful employment, but that he had not had a surgical operation performed on himself, at his own expense, so that the impairment resulting from a lumbar disc protrusion could be remedied by such an operation, if, in fact, appellee suffered from a lumbar disc protrusion; but if he did not, it would be necessary to have a surgical operation for a lumbar disc protrusion to see if he suffered from that condition.

It seems to us a reasonable conclusion that, since the Hearing Examiner had not made a finding as to whether appellee's condition was remediable, as the district court had directed on its order remanding the case to the Hearing Examiner for this specific finding, the Appeals Council considered it necessary to find "that the claimant's condition is amenable to surgery which, if performed, would alleviate his symptoms and result in a further increase in his ability to function and engage in occupations which may now be beyond his capacity. * * * Under the law, an individual will be deemed not under a disability if, with reasonable effort and safety to himself, the impairment can be diminished to the extent that the individual will not be prevented by the impairment from engaging in any substantial gainful activity * * *. Thus, in the instant case, the Appeals Council finds that the claimant has not established that he suffers from an *irremediable* impairment and, therefore, his condition cannot be said to be of long-continued and indefinite duration as required by * * * of the Social Security Act."

What is the Appeals Council saying in its decision? It holds that appellee's condition can be remedied by surgery and, therefore, it is not irremediable. But what is the need of saying that, since it also says that it affirms the Hearing Examiner's decision on disability—which did not mention surgery or remediable conditions—but held only that in his present condition, appellee could perform

work of a substantial gainful nature and, therefore, because of this fact, was not entitled to disability benefits. Why did the Appeals Council go into the question of remediable surgery at length if the appellee, in any event, could perform substantial gainful employment? The only answer seems to be that the Appeals Council did not really believe that appellee, in his present condition, could perform substantial gainful employment, but that he needed a remedial surgical operation to do so; and that it decided to affirm the contrary decision of the Hearing Examiner anyway—and satisfy the district court that it had answered the question upon which the case had been remanded for a specific answer as to whether appellee's condition was remediable. The decision of the Appeals Council is not persuasive in the light of the facts that the court has been obliged to dig out and find in a record that has all of the quality of an almost inpenetrable thicket.

Between the first hearing conducted by the Hearing Examiner, and the second hearing conducted by the Hearing Examiner, there is considerable confusion; and between the two hearings conducted by the Hearing Examiner, and the decision of the Appeals Council, there is added confusion, all, however, resulting in an unfavorable decision for the man suffering from the impairment, who, because of it, can no longer perform any work of the type he had previously performed.

The medical evidence is copious, and constitutes a large part of the record of 327 pages; and we shall relate it in as much detail as possible in the chronological order of the physical examinations and reports of the physicians and surgeons involved.

On February 17, 1956, shortly after appellee's accident, etc. Dr. Curwood R. Hunter, a neuro-surgeon, reported, after a physical examination, that appellee had a marked restriction to straight leg raising on the left side; tenderness on pressure over the lumbosacral interspace, sensory impairment of marked degree over the distribution of the first sacral

dermatome on the left; depression of both ankle jerks though greater on the left side, and that these findings indicated a herniation of the intervertebral disc at the lumbosacral level on the left side; and that appellee should be admitted to the hospital for further investigation to include myelograph and if this study confirmed a suspected disc, "then surgery would be in order."

On July 5, 1957, Dr. Edward R. Smith examined appellee and found that he had tenderness in the left lumbar paravertebral area and suffered from a ruptured intervertebral lumbar disc, and thus he was totally disabled.

On April 6, 1959, Dr. McLeod Patterson reported, after examination, that appellee had a rupture of the intervertebral disc and was totally disabled for labor. He went on to state that "Consultants and examiners seem agreed that surgery is indicated. Patient should be strongly urged to accept this type of rehabilitation."

On August 5, 1959, Dr. William K. Massie filed a report that appellee received a back injury February 15, 1956, radiating pain to the left lower extremity; that he had intermittent attacks of pain radiating to the lower leg but these attacks were not constant. Furthermore, he stated that appellee could do light work but on occasions the attacks were so severe as to prevent him from doing any work; that he had tenderness over the lumbosacral joint, and a possible degenerated disc through L–5 and S–1.

On September 12, 1959, Dr. Frank E. Kugler examined appellee and reported that the clinical examination revealed evidence of a protruded lumbar disc with left sciatic pain. Dr. Kugler stated: "The patient is totally disabled at this time."

Dr. McLeod Patterson filed another report on January 13, 1961, changing his former diagnosis of ruptured intervertebral disc to "radiculitis, cause undetermined," saying there was little objective evidence of disease and the presence of disc disease was not confirmed, but "dis-

position of this case requires orthopedic opinion."

On January 13, 1961, Dr. Hunter filed a further report showing that appellee had had marked stiffness of the cervical spine; sensory loss over distribution of the sixth cervical dermatome on the left side; tenderness on pressure over the lumbosacral interspace; marked restriction to straight leg raising on the left; sensory impairment over distribution of the first sacral dermatome on the left; absence of the ankle jerks, and that the findings indicated a herniated intervertebral disc in the lower lumbar area and the *probability of a second such lesion in the cervical region.* Appellee was referred for X-rays of the cervical spine which were reported by Dr. W. R. Dickens. Dr. Hunter further stated that he believed appellee was disabled for his occupation as a laborer, but he anticipates following through with suggested surgery sometime in the future "which should reduce his disability substantially."

It further appeared, from the evidence, that at this time appellee had been wearing a back brace for the previous year.

On January 18, 1961, Dr. Hunter further reported that he had, on that date, examined appellee, and that he had a herniated intervertebral disc in the lumbar region and probably a second disc in the cervical area. He stated: "I believe that he is presently totally disabled for his occupation as a laborer. He anticipates doing something about his problem surgically sometime in the future and it is felt that this will reduce his disability considerably."

On March 4, 1961, Dr. Marion G. Brown reported that appellee had been treated in the past with a brace for the low back which he stated did not help; that he also had a considerable amount of discomfort in the neck and the left upper extremity; that upon examination of appellee's back, he had moderately limited motions in all directions, especially forward bending which caused pain in the lumbosacral area. There was also pain in this area to percussion, and diminished sensation to pin prick on the outer side

of the left foot and outer side of the left calf. On straight leg raising test on the left, appellee had considerable tightness and discomfort in the hamstrings, with a pulling sensation in the low back. Dr. Brown reported on X-rays which were taken on February 17, 1961, stating that there was a reversal of normal cervical curvature of the spine, and the body of C–6 is smaller posteriorly than anteriorly; also that there was a mild encroachment upon the right sixth neural foramen, a loss of normal lumbar curve, compression of C–6 and evidence of muscle spasm. In conclusion, Dr. Brown stated that appellee had disc difficulty both in the cervical and in the low lumbar level, although the lateral was the disabling situation. He felt that appellee should be hospitalized, have myelograms, and probably should have a disc operation, possibly with lumbosacral stabilization. Dr. Brown's opinion was that with regard to appellee's condition at that time and until he had the treatment above suggested, "it is definite that he is totally disabled as regard any type of labor."

On July 26, 1961, Dr. C. W. Ely examined appellee and, after a complete examination, diagnosed his condition as ruptured intervertebral disc, "and was unable to work."

On September 25, 1961, Dr. Ira F. Wheeler examined appellee, stating that he had been recently hospitalized from September 5 to September 10 for a ruptured disc, and that according to previous X-rays of cervical and lumbar spine, he was suffering from compression at C–6, and possibly lumbar. He further stated: "The examination of back reveals moderately limited motions in all directions, especially forward bending. Reflexes physiologic, tightness in hamstrings gives considerable pain on straight leg raising and pain in lumbar region. The neck also gives trouble with limited motion and pain in left lateral neck muscles. He also has some weakness in the left arm muscles and some pain.

"IMPRESSION: Ruptured disc. Cervical and lumbar spine.

Totally disabled unless operation for ruptured disc may help."

In July 1962, appellee was hospitalized for six days with his back and neck in traction.

On November 5, 1962, Dr. T. D. Yocun filed a report in which he stated that appellee came in "for back evaluation." Dr. Yocun had apparently seen none of the reports of the other physicians and surgeons, with the exception of the X-rays taken by Dr. Brown at some unspecified date. Dr. Yocun's "back evaluation" was authorized by the Division of Public Assistance of the State of Kentucky. He was not consulted by appellee. Dr. Yocun started his report by stating that appellee "gives a long, rambling, uncertain history of low back injury apparently in 1956." This indicated a rather cold, if not hostile, approach to the question of appellee's injury, since there was nothing uncertain about this history of appellee's back pain, as that condition clearly appears from the foregoing reports of nine physicians and surgeons who examined him, had him immobilized in the hospital, placed him in traction, and took X-rays of his spine, afterward filing comprehensive accounts of their diagnoses and of appellee's condition. The professional nature of Dr. Yocun's "back evaluation" suffers in quality, as seen in his gratuitous statement that appellee, whom he had seen only on this one occasion, "has been well enough to raise a considerable family although he has not been well enough to support them." According to Dr. Yocun, the neurological examination was negative, the examination of the upper extremities and neck was essentially negative; hyperextension and flexion were both limited, otherwise nothing of significance was found; review of the X-rays, including complete lumbosacral series and oblique films of the cervical spine were essentially negative; there was no evidence of an old fracture; two views of the cervical spine available revealed slight posterior lipping, otherwise nothing of significance was noted; and to conclude the report, Dr. Yocun stated that appellee, in his opinion, was exag-

gerating his disability and symptoms; and his only suggestion for appellee would be psychotherapy and perhaps vocational rehabilitation in the form of physical therapy *to regain his confidence in himself, and his capacity to work.* This is contrary to the mass of medical evidence for the entire six years prior to Dr. Yocun's report.

On November 12, 1962, Dr. Brown wrote appellee, Mr. Davidson, stating that there was another test that should be done before considering any operation, and that this was in the nature of a myelogram which would show whether or not he would need an operation; and that as to the operation, *"it is a major operation and is not without some danger."*

On December 28, 1962, Dr. Eugene Parr examined appellee and stated, among other matters, that in the lumbosacral spine it was revealed "that the patient guarded his motions in all directions particularly forward flexion." In the Government's brief, the above quotation is given that "the patient guarded his motions [faked] in all directions particularly forward flexion"—an unjustified interpolation even though it be placed in brackets.

Dr. Parr also stated:

"At the present time the patient states that his low back feels tired and weak and if he happens to make a misstep pain may be elicited in its posterolateral aspect. The pain may radiate as far as the lateral three toes of the left foot and may be accompanied by numbness. Coughing and sneezing aggravate the low back discomfort. Past history reveals that the patient has had low back pain since he was injured on February 15, 1956 near Cincinnati, Ohio.

\* \* \* \* \* \*

"X-RAYS: CERVICAL SPINE: The disc spaces are normal. There is minimal osteoarthritic lipping on the lower cervical vertebra posteriorly. There is some narrowing of the neural foramina of C3, C4, and C5 on the left side by these hypertrophic spurs. The neural foramina on the right are normal. No other bony abnormality is noted.

"LUMBAR SPINE: The disc spaces are normal. The articular facets are intact. No arthritic changes can be demonstrated. There is a mild degree of scoliosis of the upper lumbar spine with the convexity to the right.

"IMPRESSION: NECK AND LEFT UPPER EXTREMITY DISCOMFORT: This may very well be secondary to root pressure from the slightly narrowed foramina involving the cervical spine on the left. On the basis of the patient's symptomatology, physical findings, and x-ray findings it is my opinion that he should have a neurologic evaluation and that this could best be performed with the patient hospitalized. At the time of the hospitalization, the patient could be undergoing a program of conservative treatment to the neck consisting of heat, massage, and neck traction. It is very likely that the neurologist or neurosurgeon would choose to do a myelogram and unless something serious was revealed, which I doubt, it is my impression considering everything that this patient should do well and should be able to be completely rehabilitated so far as his neck and left upper extremity are concerned. The conservative program would of necessity need to be continued after release from the hospital for many months.

"In regard to this patient's back, considering his symptoms, which he tends to exaggerate and this is carried over into the physical examination to some extent, I am of the opinion that there is no definite existing problem at the present time. I find nothing in regard to his back that would cause me to feel that he has any impairment presently."

Dr. L. R. Nickell of St. Joseph Hospital made a report on appellee, dated January 22, 1963, which reads as follows:

"MYELOGRAPHIC EXAMINATION: of the sub arachnoid space

from the terminal end of the caudal sac to the adenomatoid process was performed. There is slight lateral root sleeve asymmetry at the level of the intervertebral disc between the 6th and 7th cervical vertebrae, the root sleeve on the left at this level demonstrating a slight superolateral indentation. Oblique films fail to demonstrate abnormality, lateral films of this area were normal. No other intro or extra dural abnormality of intervertebral body is noted.

"IMPRESSION: 1) Radiographic findings consistent with a left lateral protrusion of the intervertebral disc, at the C6, C7 interspace level."

On April 9, 1963, Dr. Brown stated that the myelographic studies had been performed and that myelograms showed cervical disc protrusion at C–6 on the left; and that neurosurgical final opinion was that appellee should be treated conservatively which would mean a rehabilitation program including head halter tractions "and probably several visits to my office over the next six months in an attempt to rehabilitate this patient."

On July 22, 1963, Dr. Ira F. Wheeler reported that the X-rays of appellee taken in 1961 showed compression of C–6; evidence of much spasm; loss of normal lumbar curve; that surgery was indicated, if the orthopedic consultant agrees. Dr. Wheeler stated that he did not know whether appellee had refused surgery or not; that there was no contra indication to surgery, but the prognosis was deferred because of *"long-standing and possible fixed neurosis now."*

Dr. Richard L. Roth, a neurosurgeon, who examined appellee on July 24, 1963, for the Division of Disability Determinations of the State of Kentucky, stated that he was rather sure that appellee had a herniated lumbar disc fragment, but he did not understand why he should have severe pain for the past seven years. Dr. Roth stated that it would seem, by this time, there should be degeneration of the nerve root and that the pain should be lessening. He stated he thought that appellee's pain might be of a moderately severe degree; that appellee's complaints, and the positive jugular-compression test would make him feel rather strongly that appellee could also have a herniated cervical disc. Dr. Roth gave it as his opinion that appellee was then disabled, and had been disabled for the past seven years up to the time the report was filed. He said that he was of the opinion that appellee should have a myelogram (not knowing that a myelogram had already been performed and the report thereof filed), and that if the appellee should definitely have free disc fragments in the spinal canal, he should, as a result of the myelogram examination, have the advantage of surgical care from which he could probably get considerable relief and perhaps be able to return to a light type of labor.

Dr. Auerbach, to whom appellee was referred for orthopedic evaluation, on August 1, 1963, expressed the opinion that appellee had a disc-like problem, although nothing objective had been found on physical examination or by myelogram to substantiate his condition. The Hearing Examiner remarked of this evidence that: "There is no great *objective* evidence of disease, according to this physician." Dr. Auerbach stated that appellee *"Presents a difficult problem in diagnosis"* and gave it as his opinion that appellee may well have a chronic back condition, as well as some problem in the cervical spine area, and that he would be inclined to give appellee the benefit of the doubt if psychiatric consultation would clear him for surgery and that, at that time, appellee was unable to perform any work in the ordinary sense. As the Hearing Examiner commented, "However, the neurologist felt, from a truly *objective* physical point of view, there is little to substantiate claimant's complaints. X-rays made of the entire cervical and lumbar spine were not remarkable except in the cervical area of flexion and extension laterally, showing the lower cervical spine not to flex as much as the upper portion. There was some slight increase in lumbar lordosis but there was no definite demon-

strable paraspinal muscle spasm present. Straight leg rising was apparently limited on the left side with the same complaint of pain by the claimant. He could straight leg raise to 80 degrees on the right and 40 degrees on the left before he complained. He also complained of back pain when the hip was flexed with the knee bent. There was no measurable atrophy of the lower extremities. The reflexes were present and equal. Sensory check was considered equivocal."

Dr. Auerbach reported that on August 1, 1963, one week before the last hearing before the Hearing Examiner, appellee was willing to have surgery performed on his back, or have performed whatever needed to be done. Moreover, Dr. Auerbach stated that if appellee was cleared for surgery, he "should have exploration of the 4th and 5th lumbar disc spaces, and, if nothing found, a spinal fusion carried out."

In case a spinal fusion would be carried out, Dr. Auerbach stated:

"This would of course still leave us with the question of neck pathology. This is a problem that would have to be faced when the back is corrected. With a single problem such as the cervical spine this patient would probably be able to perform ordinary type of work although the work would not be able to have heavy lifting associated with it."

Obviously, from the foregoing, Dr. Auerbach considered that the cervical condition was a minor matter, and that it was the back condition in the 4th and 5th lumbar disc spaces that was the real disabling condition.

According to the description of him given by the Health Examiner in his decision, Dr. Auerbach was "the consultative neurologist," and apparently one of the medical authorities supplied by the Social Security Administration.

On August 16, 1963, Dr. Hunter, after the last hearing before the Hearing Examiner, which took place on August 8, and six days before the filing of the Hearing Examiner's final decision, wrote the Hearing Examiner, in reply to the latter's inquiry, stating:

"In reply to your inquiry regarding Seldon Davidson, Account No. 407–30–1722, I would state that as of the last time I saw this patient on January 18, 1961, I felt that his disability could be substantially reduced by surgery. I felt at that time that his hospital investigation as a candidate for surgery was indicated and there appeared to be no particular contraindications to surgery though a thorough investigation would be necessary to prove this point. The patient did not refuse surgery but stated to me that sometime in the future he would like to go ahead with an operation. The prognosis for returning a patient to some type of useful occupation after the performance of disc surgery is generally good."

Dr. Hunter, however, considered appellee, in his then condition, as suffering from an impairment that rendered him "presently totally disabled for his occupation as a laborer," and disabled for any work unless he underwent a surgical operation for a herniated intervertebral disc in the lumbar region and probably for a second disc in the cervical region.

The Government in its brief, refers to various reports of the Division of Public Assistance of the State of Kentucky, most of them made by physicians who had never seen appellee, or by social workers, to the effect that appellee failed to cooperate with plans for his rehabilitation. It dwells on the circumstance that the reports of the Kentucky relief agencies refer to the fact that appellee was not incapacitated, and refused to submit to surgery or cooperate with plans of helping himself become employable. This was all weak hearsay, and such evidence was demolished by the uncontradicted and unquestioned testimony of appellee, and the medical witnesses who testified that appellee was willing to follow any plan that could be suggested for his rehabilitation, and undergo any surgery recommended, although he had been warned it might be serious or even dangerous.

A good instance of the nature of this type of evidence is seen in the conclusion of the so-called "Review Team" of the Public Assistance Division of Kentucky, which the Referee of the Division refused to follow in his Decision of July 6, 1961.

The finding of the "Review Team" is about the same as that of the Hearing Examiner in the instant case. Thus, in view of the fact that Dr. Patterson gave a diagnosis of rupture by intervertebral disc, and reported appellee's disability was total for labor; that Dr. Smith gave the same diagnosis and reported "Total disability"; that Dr. Patterson presented another report diagnosing the same condition and found "Total disability for labor"; that Dr. Massie reported possible degenerated disc stating that appellee could do light work, but on occasions the pain was so severe as to prevent him from doing any work; that Dr. Kugler reported appellee had a protruded lumbar disc and "The patient is totally disabled at this time"; that Dr. Patterson in another report gave a diagnosis of "radiculitis" and that the disposition of the case required orthopedic opinion; that Dr. Hunter reported herniated intervertebral disc and "Totally disabled for his occupation as a laborer"—in spite of these findings, the Review Team of the Kentucky Division of Public Assistance found appellee not incapacitated, and that if he made definite plans to accept treatment, the case might be approved for surgery and convalescence. This seems a tour de force in reasoning, which the Referee, in that proceeding, was not able to abide.

What kind of man, as a worker, was appellee before the accident disabled him? As late as March 18, 1963—seven years after the accident, and less than five months before the final hearing before the Hearing Examiner, Daniel B. Pope, Counselor of the Bureau of Rehabilitation Services of the State of Kentucky, reported:

> "The client is a life-time resident of Kentucky. He is neat in appearance, well adjusted, and appears to be well motivated. The client is of average intelligence.

> "The client lives with his wife and seven children, ages six to fifteen years, in a rented home which is substandard for the area. Their living conditions are also substandard. They have very little social activities. However, they do have religious affiliations with the Baptist Church. Their social activities are limited to church affairs. * * *

> "The client is vocationally handicapped due to the degenerative disc in his back which is a substantial handicap to employment. The client is eligible with reference to economic status. * * *

> "*The client has a good work history, having worked twelve years for a lumber mill.*" (Emphasis supplied.)

About a month after his injury, in 1956, his doctor told him to go back and try to work, which he did, for about a day. But the pain was so severe, he could not continue. In the Fall of 1959, he tried to get a job in a lumber mill at the Weaton Lumber Company in Salem, Indiana, but was unable to do the work and returned home to Kentucky. A little later, he got a job with the Farm Bureau for a week or two doing light work, but was unable to carry on with this due to back pain.

With regard to his willingness to follow any procedure for his rehabilitation and to undergo any kind of surgery, appellee testified: "You notice they said I must make myself available for rehabilitation, and they had me come in and meet Mr. Cox." Appellee further testified that he had repeatedly appealed to Mr. Cox, the Rehabilitation Director in charge, and told him, in the Fall of 1961, that the Division of Public Assistance of Kentucky wanted the Rehabilitation Director "to send me to the hospital to be doctored. And so he had my record there and he says, 'No.' *He says 'It wouldn't make you able to work for labor if you had surgery.'* And says, 'I'll see them before I leave here.' And I've not seen either one of them since. I'm still

drawing public assistance." (Emphasis supplied.)

On the hearing in the instant case, the Hearing Examiner interrogated appellee as follows:

"Q. Now, have they said anything about surgery in recent months? Dr. Wheeler said that you have a ruptured disc, cervical and lumbar spine, and that you are totally disabled unless an operation on the disc may help. And that was just this last September when he wrote that. Well, Dr. Brown, if you notice, says that 'in his present condition and until he has this treatment * * *' In other words, surgery. It seems like they are all talking about surgery over and over. Here is one Dr. Hunter said 'Disabled for labor.' But he anticipated following through with suggested surgery 'sometime in the future which should reduce his disability substantially.' That was in January '61, just a year ago. Let's see now. They recommended surgery when you first got hurt or a month or two after?

"A. Well, Dr. Hunter said, 'You may have to go at any time.' He said, 'If you do, you have to call me in emergency.' Said, 'You may have to have surgery.' But whether they ever did offer me to go, did they or did they not? (Question directed to wife.) I'm asking my wife. I don't know. He told me that when I went to him but any remembrance any farther than that—

"Q. And did you say you would not?

"A. No.

"Q. You never refused?

"A. No.

"Q. You told them you would not have surgery?

"A. No, I never told them that."

 * * * * *

"Q. You never refused any doctor's surgery?

"A. No.

"Q. You have always been willing to do whatever the doctors said do?

"A. Yes. As I told you awhile ago, on the welfare they told me I would have to make myself available for rehabilitation and so I did. I met the man last fall and told him that I was there for him to send me to the hospital for surgery.

"Q. When was that now?

"A. That was in the last part of the summer or early fall, I don't know exactly. Mr. Cox—his office is at Harlan.

"Q. 1961?

"A. Yes.

"Q. You went to see Mr. Cox?

"A. Yes, he's the rehabilitation man.

"Q. The rehabilitation director?

"A. Yes.

"Q. That was of the vocational rehabilitation?

"A. Yes.

"Q. And that you were ready for surgery if necessary?

"A. That's right.

"Q. In other words, the doctors have never got down to brass tacks and said, 'We're ready. Come on.'?

"A. No.

"Q. In other words, they have never instructed you to have surgery?

"A. No, they just talked about it.

"Q. So you've never refused it?

"A. No."

We have then, before us, appellee who has repeatedly stated and testified that he is willing to undergo any procedure for rehabilitation, or any kind of surgery—even for a spinal fusion—but who has never been advised by anyone to undergo surgery or to follow any method of rehabilitation. We have the decision of the Appeals Council that, even if appellee is disabled for any substantial gainful activity, "Dr. Hunter stated that claimant's condition *was* amenable to surgery." Dr. Hunter never made the statement quoted by the Appeals Council; and he never used the expression, "amenable to surgery." It would be meaningless if he had. If appellee was "amen-

able" to surgery, it could mean only that appellee was answerable, responsible, accountable to, or willing to yield or submit, or responsive, such as a person who is said to be amenable is a responsive person. It could not possibly mean that surgery would help appellee or remedy his condition; and the Appeals Council never said or held that appellee's condition could be remedied by surgery.

But even though it attempted to suggest that appellee's condition could be remedied by surgery, the evidence is uncontradicted that no one ever told appellee that it could be. As was heretofore stated in the questions of the Hearing Examiner and the answers of appellee during the hearing:

"Q. In other words, the doctors have never got down to brass tacks and said, 'We're ready. Come on.'?

"A. No.

"Q. In other words, they have never instructed you to have surgery?

"A. No, they just talked about it.

"Q. So you've never refused it?

"A. No."

However, regardless of this cul-de-sac, we get back to the fact that, in any event, the Appeals Council affirmed the Hearing Examiner's decision that appellee was not disabled from performing substantial gainful employment because he could, according to some of the testimony, perform light work.

■ The general statement of a physician that a claimant could perform "light work" is not substantial evidence that he is able to engage in substantial gainful employment, Popovich v. Celebrezze, 220 F.Supp. 205 (W.D.Pa.). In the *Popovich* case, Chief Judge Gourley was called upon to determine whether the testimony of an expert medical witness, that an applicant "could do light work," constituted "substantial evidence" to support a finding that claimant was able to engage in substantial gainful employment, and he held that such testimony did not constitute such substantial evidence. In determining the case, Judge Gourley said:

"Of the nine medical and hospital reports from five different doctors, none of whom was the personal physician of the claimant, and one hospital, only one doctor affirmatively indicated an ability to do even 'light work', and none of them even implied that claimant was not continuing to have difficulty with his back. Even Dr. Stuart N. Rowe, who felt that claimant could do light work, found atrophy in the left lower leg and an indentation at L–4, L–5, and gave a diagnosis of

'? Recurrent herniated disc

? Epidural scar,'

stating that patient may require further surgery in the future.

"The statement of Dr. Rowe that claimant can do light work cannot be deemed 'substantial evidence' on which to rest the finding that claimant is able to engage in substantial gainful activity, for the reason that the bald statement of Dr. Rowe that claimant 'could do light work' does not even purport to define the extent to which claimant can do light work. Dr. Rowe, in his medical report, expresses no opinion as to whether the claimant is one of that class of persons who have sustained an injury but are capable of steadily performing certain types of light work which are presumably available and procurable, or whether he is one of that class who are not able, uninterruptedly, to do even light work owing to their physical limitations, a person labeled in Pennsylvania as 'a nondescript.' See Stewart v. Commonwealth, 198 Pa.Super. 261, 182 A.2d 100 (1962). Absent such a definition of the extent to which claimant can do light work, the report of Dr. Rowe cannot constitute 'substantial evidence' to support a finding that claimant is able to engage in substantial gainful employment.

"At most, the report of Dr. Rowe can be deemed to constitute 'substantial evidence' to support a finding that claimant can, with interruptions, do light work. Under these circumstances, for claimant to find gainful em-

ployment, a job would have to be made for him and we must be realistic enough to understand and appreciate that in the labor market today, jobs are not made for any person. Nothing in the record before the Court suggests that there is any such reasonable possibility available to the claimant.

"On the basis of the composite medical testimony, the uncontradicted testimony of the claimant, the fact that all of the doctors' reports were made at the behest of either the Social Security Administration or claimant's employer's workmen's compensation carrier, and the reasonable interpretation to be made of the report of Dr. Rowe when the entire report is considered, it is evident that there simply is not substantial evidence in the record to support a finding that claimant is capable of doing a type of light work of which there is a reasonable possibility of being employed to do."

In Massey v. Celebrezze, 345 F.2d 146, 155 (C.A. 6), this court said:

"The instant case is similar to Cyrus v. Celebrezze, 341 F.2d 192 (C.A. 4) decided January 5, 1965, in which it appeared that the physicians who were intimately familiar with the claimant's medical condition, concluded that he was totally and permanently disabled and impossible to rehabilitate; that, on the other hand, there were assertions of two physicians, hired by the Social Security Administration to evaluate claimant's condition, and that they expressed the view that claimant would be able to work if he could arrange to sit for two four-hour shifts. One of these physicians was most guarded in his answer, stating that he saw no *neurological* reason disqualifying the claimant from such an undertaking; but both of the Administration's physicians frankly admitted 'that because they had no prior knowledge of Cyrus' history and only a limited time in which to examine him, their evaluations might not be entirely accurate.' The court, in arriving at a determination of the case, said:

" 'The medical evidence that Cyrus suffers from a disability is uncontradicted. The only conflict is as to the extent of his residual capacity. Normally, it is for the Secretary and not the courts to resolve conflicts in the evidence. Snyder v. Ribicoff, 307 F.2d 518, 520 (4th Cir. 1962). *But where the Secretary places reliance upon one portion of the testimony to the disregard of overwhelming evidence to the contrary, the Secretary's conclusions may not stand.* Thomas v. Celebrezze, [4 Cir., 331 F.2d 541].' " (Emphasis supplied.)

In Sebby v. Flemming, 183 F.Supp. 450 (D.C.W.D.Ark.), two physicians who had treated the applicant for disability benefits over a period of years stated that he was totally incapacitated, while a physician to whom the applicant had been referred by the Social Security Administration stated that in view of his condition, he would place the applicant in a class "with slight limitation of activity" and "I believe he should be able to do some work." The Hearing Examiner on the evidence of the Social Security Administration held that while the applicant was unable to perform work requiring stress, strain, or heavy physical exertion, it did not appear that he would be precluded from engaging in many types of light or sedentary work, and that the "consultative specialist" expresses the opinion that he should be able to do some work, and that if he could overcome his anxiety, he would get along much more satisfactorily. The Hearing Examiner, accordingly, held that the applicant's impairments "are not of such severity as would continuously preclude him from engaging in any substantial gainful activity * * *." Chief Judge John E. Miller, in reversing the decision of the Secretary and remanding the case for the granting of disability benefits, held that there was no substantial evidence to support the conclusions of the Secretary, and stated: "Two doctors who have treated [applicant] over a period of years advise him

not to work and state that he is totally incapacitated. The only evidence in support of the Referee's findings is the medical report of Dr. Hall, based upon one examination of the plaintiff." In his determination of the case, Judge Miller said:

"After reading and considering the whole of the record, the court does not find that the Referee's conclusions are supported by substantial evidence. It is obvious that the findings of the Referee are based almost exclusively on the medical report of Dr. Hall. However, the court does not find that Dr. Hall's report is sufficient to constitute substantial evidence in the light of the other medical evidence and other facts reflected in the transcript as a whole. The substantiality of evidence must take into account whatever in the record fairly detracts from its weight. Universal Camera Corp. v. N.L.R.B., 1951, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456.

"In discussing the requirement of a review of the whole record in cases of this type, Professor Davis, in Sec. 29.03 of his recent Treatise on Administrative Law, quotes Professor Jaffe at page 127 of Volume 4 as saying:

' "Obviously responsible men would not exercise their judgment on only that part of the evidence that looks in one direction; the rationality or substantiality of a conclusion can only be evaluated in the light of the whole fact situation or so much of it as appears. Evidence which may be logically substantial in isolation may be deprived of much of its character or its claim to credibility when considered with other evidence." ' [Jaffe, Administrative Procedure Re-examined: The Benjamin Report, 56 Harv.L.Rev. 704, 733 (1943).]"

■ Merely because a physician states that an applicant is not suffering from an impairment that precludes him from engaging in substantial gainful activity; that he has only a slight limitation of activity; and that he should be able to do some work, is not substantial evidence that applicant can engage in substantial gainful activity, when viewed in the light of the evidence of other doctors who had continuously treated applicant, and testified to the contrary, and, in the light of the facts reflected in the transcript as a whole.

■ The foregoing authorities clearly enunciate the law to the effect that it is the duty of courts to examine meticulously the evidence, no matter how burdensome that duty is, because of the helter-skelter nature of the records in these cases, and not adopt the facile way of disposing of an injured applicant's case by reference to, and reliance upon, the statements of one or two physicians, as against the considered statements of many physicians and surgeons who have had more opportunity of examining and treating the applicant, more occasions of making medical reports upon him, and more expertness in diagnosis, as well as upon consideration of the facts reflected in the transcript as a whole.

■ Once the applicant for disability benefits has offered evidence of the work he has done, and his inability to do that kind of work any longer, the burden is upon the Secretary to show that he can do some work of a substantial gainful nature.

In Jarvis v. Ribicoff, 312 F.2d 707, 710 (C.A. 6), the court said:

"What can appellant do in the way of engaging in a substantial gainful activity? The activity in which he must be able to engage must not only be 'gainful,' but it must also be 'substantial.' Ellerman v. Flemming, D.C., 188 F.Supp. 521, 526. Admittedly, he can do no kind of laborious work. As the Hearing Examiner says, *appellant's ability to get about has been impaired; he is subject to much pain and discomfort; his impairment restricts the normal functioning of bodily movement;* and there is indication that it would interfere with any type of employment unless it were very light and sedentary in nature. What kind of

employment could this be? The determinative factor is not how substantial the gain, but how substantial the activity, in which the claimant can be gainfully engaged. Ellerman v. Flemming, supra. The writer of this opinion cannot think of any type of substantial gainful activity in which appellant could engage. If he could wash the dishes in the home or perform any similar light duties, that would not constitute substantial gainful activity. With only a fifth-grade education his sole experience has been farming and working in heavy industry, and it is admitted that he cannot now engage in that kind of activity.

" 'Under the Social Security Act, unlike some other statutes, it is not the burden of the claimant to introduce evidence which negatives every imaginable job open to men with his impairment, and of his age, experience and education. It is quite enough if he offers evidence of what he has done, of his inability to do that kind of work any longer, and, of his lack of particular experience for any other type of job. If there are other kinds of work which are available and for which the claimant is suited, it is the defendant's burden to adduce some evidence from which a finding can be made that he can do some type work; actually, not apparently. * * * Here, the Referee has made no such finding whatsoever, based on evidence.' Ellerman v. Flemming, D.C., 188 F. Supp. 521, 527 (Emphasis supplied.)

" '[The Claimant] was not required by the use of a catalogue of the nation's industrial occupations to go down the list and verbally negative his capacity for each of them or their availability to him as an actual opportunity for employment.' Butler v. Flemming, 288 F.2d 591, 595 (C.A. 5).

" '[The] test of a claimant's disability or inability to engage in any substantial gainful activity is a subjective one and claimant need not establish complete absence of any opportunity for substantial gainful employment and he need only establish that he has become disabled from employment in any work in which he could profitably seek employment in the light of his physical and mental capacities and his education, training and experience and he need not be totally helpless or bedridden.' Randall v. Flemming, D.C., 192 F.Supp. 111, 112."

In De Gracia v. Secretary of Health, Education and Welfare, D.C., 248 F.Supp. 522, 526, the court said:

"In an application for social security disability benefits, *the hearing examiner must determine whether there is reasonable opportunity for the claimant to compete, in the manner normally pursued by persons genuinely engaged in seeking work.* He must take into consideration the determined capabilities and skill of the individual as well as the availability of employment in that field within the geographical area which claimant would normally be expected to consider. Celebrezze v. Kelly (5th Cir., 1964), 331 F.2d 981."

In order to sustain its contention that the Secretary's determination was sustained by substantial evidence, appellant contends there was a diversity of opinion among the doctors and that Doctors Parr, Yocun, Brown, and Jones finally concluded there was nothing wrong with claimant's low back. Dr. Parr, however, related that appellee "had low back pain since he was injured on February 15, 1956." Dr. Brown reported in 1961 that appellee had disc difficulty in the low lumbar level, and that he should be hospitalized and probably have a disc operation with lumbosacral stabilization. He never stated that there was nothing wrong with appellee's back. Dr. Jones, who saw appellee in February 1963, considered the myelogram to be negative except that it showed a small defect at the 6th cervical space. The neurological examination was essentially negative. Dr. Yocun's report we have already discussed, with its only recommendation of

"psychotherapy and perhaps vocational rehabilitation in the form of physical therapy to regain his confidence in himself and his capacity to work."

With regard to Dr. Yocun's evaluation, upon which the Government relies so greatly, we turn to Lippert v. Ribicoff, D.C., 215 F.Supp. 28, 29, in which the court, in referring to a similar situation, said:

"The Examiner quoted from Dr. Pope's Report the internist's opinion that it is difficult to evaluate plaintiff '* * * because one sees men with no more disability than this man presents but with proper motivation performing very adequately.' * * * Dr. Pope concludes: *'I'm afraid his lack of motivation will probably interfere with his performing adequately in any position in which he is placed.'* * * * The Examiner apparently relied on these statements to support a finding of no disability. However, *the law compels that such medical evidence is more proof of disability rather than the contrary.* As was stated in Ollis v. Ribicoff (W.D.N.C.1962), 208 F.Supp. 644, at 648, plaintiff's 'physical and *mental* capacity to resist or adapt' to his impairments is a 'proper basis for evidentiary inferences on these matters. Underwood v. Ribicoff, supra, [298 F.2d 850 (C.A. 4)].'" (Emphasis supplied.)

But even if it be assumed that the four above-named doctors concluded there was nothing wrong with appellee's back (which was not the case), the Hearing Examiner in his second decision found that it was clear from the evidence that appellee had trouble with his low back, but that this condition, *while causing discomfort and pain, did not warrant a conclusion that it was disabling, since pain could not be considered a disability in itself,* and the Appeals Council found that the *low back condition* was "amenable to surgery" which would alleviate appellee's symptoms.

In the light of these findings of the Hearing Examiner and the Appeals Coun-

cil, what becomes of the contention now made, by Government counsel, that some of the physicians said there was nothing wrong with claimant's low back? That evidence, even by the standards of the Hearing Examiner and the Appeals Council, which, on other grounds we find is based on reversible error, goes out the window, since it is evident that no attention was paid to it in any of the decisions of the Secretary.

 We come then to the evidence proffered by the Secretary with regard to job opportunities available to appellee. As said by this court in Miracle v. Celebrezze, 351 F.2d 361 (C.A. 6), "There was the evidence of the 'Vocational Counselor,' who has become a stock figure in these cases, and who, as usual, availed himself of the U. S. Dictionary of Occupational Titles to point out what work was available"—a book in which 22,000 different jobs are listed by some 40,000 titles. The citing of catalogs or dictionaries which list or contain capsule descriptions of thousands of jobs is unpersuasive testimony on the issue of whether disability benefit claimant is able to engage in substantial gainful activity. Freeman v. Celebrezze, 236 F. Supp. 785, 786 (D.C.N.C.) Although the Hearing Examiner found that appellee could do no work requiring him to bend over, or stoop, because of his back condition, Dr. Auvenshine, the Vocational Counselor, found that this man who had never done anything but manual labor could do bench work, lean over a bench and perform the work of "assembling of small toys, involving putting on wheels, putting things together involving the use of the hands and fingers," cutting cloth in the textile industry and fabricating lightweight metal. If anyone ever saw one cutting cloth in the textile industries, or doing the work of fabricating metal, without bending his back, he has witnessed a prodigy—and the Hearing Examiner found that appellee could do no work requiring bending, stooping, or lifting. However, the Hearing Examiner himself must have taken a look at the U. S. Dictionary of Occupational Titles

for he found that, in addition to the jobs Dr. Auvenshine has said appellee could do, he could also, subsequent to his back injury, do lightweight furniture refinishing, could operate an elevator, act as a guard or a watchman of a building, factory or warehouse, or as a lockerroom attendant—all of this in the light of his finding that appellee was disabled from work requiring bending, stooping, or any strenuous effort, and also in the light of his finding that appellee was able to stand for only three-quarters of an hour and to sit for a considerably longer period, although, because of his low back pain, he became restless after half an hour. Of course, the Hearing Examiner at the same time, held that even severe pain suffered by appellee could not be considered as a disability in itself, and that even constant pain was no excuse for not engaging in substantial gainful employment. And this very fact, in all probability, explains why Dr. Auvenshine and this Hearing Examiner found that appellee could perform these jobs, although he could not do any work requiring bending or stooping. But even so, these findings and conclusions, in the light of all the evidence, are so unreal that the Government's case seems steeped in fantasy.

■ This case represents the fallacy of a procedure by which so many applicants have been denied disability benefits by the Secretary—only to have his determinations reversed by the courts, and disability benefits granted. It used to be that the Secretary would only determine that while the disabled man could not return to his former work, he could, nevertheless, perform substantial gainful employment. The courts in such cases required the Secretary to specify what types of employment such an applicant could perform. Thereafter, the Secretary, in these cases, found that a worker who could not perform the same work as before his disability, could, nevertheless, perform *light* work of a substantial gainful nature, and then adopted the method of having a Vocational Counselor, who had never examined or questioned the applicant, read from a list of 20,000 jobs and recite all the so-called light jobs that such a worker disabled from his previous work could perform. This whole method lacks reality. To say a disabled worker can perform *light* work is not substantial evidence that he can perform work of a substantial gainful nature, as has heretofore been decided by the courts. He might be able to tend a garden, or wash dishes for his wife, or do little things around the house. This would be light work, but not work of a substantial gainful nature. To have a Vocational Counselor, who, as in this case, stated that "although I am not a physician and do not know what all the implications and ramifications of the condition are," determine solely from the statement that appellee could do light work, that he could make toys, be a cutter of fabrics in a textile factory, fabricate metals, without any evaluation as to whether the movements required in such a job would cause serious constant pain to this man, who could stand for only brief periods or sit for brief periods and was greatly limited in walking about, is without any evidentiary value.

Moreover, Dr. Auvenshine testified that the jobs he mentioned for appellee could be found "in only an insignificant number" in Eastern Kentucky, Southeastern Kentucky, and Central Kentucky, where applicant lived; and, even in the other parts of Kentucky, he admitted that the job placement authorities upon which he relied, did not show that such positions were available, but referred only to positions already filled!

It is, however, contended by the Secretary that availability of jobs does not mean job opportunities for disabled workers, but only that there are persons working in such jobs in a given area. This contention is untenable.

In Hodgson v. Celebrezze, 312 F.2d 260 (C.A. 3), the court said:

"Capabilities of a claimant for disability insurance benefits to engage in substantial gainful employment must be viewed not only in context with his

own physical, educational and vocational background *but also with respect to employment opportunities available to a man who can do only what the claimant can do,* and mere theoretical ability to engage in substantial gainful activity is not enough if no reasonable opportunity for that is available." (Emphasis supplied.)

Where there is permanent partial disability, the inquiry with respect to claimant's eligibility for social security disability benefits must be directed to the question of *what were the "economic realities" of obtaining employment in an area for persons with a combination of disabilities which claimant had.* Seldomridge v. Celebrezze, 238 F.Supp. 610, 611 (D.C.Pa.).

A determination that disability benefits claimant, despite maladies, is able to engage in some alternative occupation must be accompanied by specification of types of employment opportunities actually available to her, as mere theoretical ability to engage in substantial gainful activity is not enough if no reasonable opportunity for such is available. Ber v. Celebrezze, 332 F.2d 293 (C.A.2).

In Lippert v. Ribicoff, 215 F.Supp. 28, 33, 34 (D.C.N.D.Cal.), the court said:

"Plaintiff's entire work history demonstrates almost continuous work with his body. A detailed search of the record fails to reveal * * * that Mr. Lippert is prepared by his education, background and employment history to handle a desk job or other sedentary type employment. * * * The Hearing Examiner apparently gave little consideration to the evidence that points to plaintiff's complete inability to do any sustained activity. The record is replete with evidence that plaintiff has orthopedic ailments hampering his movements and ability to sit for any length of time or to walk any distance; that he suffers from pain associated with his liver disease which also affects his ability to carry on any sustained activity; * * *. The

record is * * * devoid of any evidence that there are employment opportunities available for the very limited and uncertain services plaintiff offers. 'If there is no market for the services he is able to render then he is truly disabled within the meaning of the statute.' Ferran v. Flemming (5th Cir., 1961), 293 F.2d 568, 571".

Availability of jobs for disabled workers means opportunity for jobs for disabled workers.

In Massey v. Celebrezze, 345 F.2d 146, 158, this court said:

"In conclusion, it is our opinion that Massey, at the time of filing his claim for benefits, was disabled from work as a miner, and, further, that as a result of his disability, he was precluded from performing any substantial gainful employment—and evidence to the contrary is lacking in substance. Moreover, there was no proof that any job, reasonably available, which Massey was capable of performing, existed within the general area in which he lived. Butler v. Flemming, 288 F.2d 591 (C.A.5); Hall v. Celebrezze, 314 F.2d 686 (C.A.6); Cyrus v. Celebrezze, 341 F.2d 192 (C.A.4)."

The *Massey* case was decided by this court on April 30, 1965. No petition for certiorari was filed.

The Secretary now asks this court to reverse itself on the *Massey* case on the ground that it was error to hold that the availability of a job which an applicant might perform, must exist *in the general area in which applicant lived.* The rule that such job opportunities must exist in the general area in which the applicant lives has been followed by this court for at least four years in numerous cases. It is the same rule previously enunciated by the United States Court of Appeals for the Fourth Circuit in Cyrus v. Celebrezze, 341 F.2d 192, and by the United States Court of Appeals for the Fifth Circuit in Butler v. Flemming, 288 F.2d 591. The reason given for the Secretary's stand is that, in House Report

No. 213, 89th Cong., 1st Sess., p. 88, it was stated:

"In line with the original views expressed by your committee and since reaffirmed, to be eligible an individual must demonstrate that he is not only unable, by reason of a physical or mental impairment, to perform the type of work he previously did, but that he is also unable, taking into account his age, education, and experience, to perform any other type of substantial gainful work, regardless of whether or not such work is available to him in the locality in which he lives."

 In the light of the many decisions of the District Courts and the Courts of Appeals holding that where a man is unable by reason of impairment, to perform the type of work he previously did, he must show he is unable to perform any other type of work available to him in the general area in which he lives, we feel that the statement above mentioned in the House Report is not the criterion by which the courts must be guided in the future. The House Report, in this regard, was not agreed to in the Senate Report, nor was any mention made of it in the Conference Report. The report of a committee of the House "does not go very far to show the intention of a majority of both houses of Congress." Porter v. Murray, D.C., 69 F.Supp. 400, 402. Since neither the Senate Report nor the Conference Report mentioned the House Report in this respect, we do not feel that it is persuasive of Congressional intent. Moreover, the many cited cases, including the adjudications of this court, referred to "work available to the claimant *in the general area*" in which he lives, rather than *"in the locality* in which he lives," as stated in the language of the House Report. This, in itself, differentiates the instant case and the *Massey* case from the circumstances envisaged in the House Report. We shall continue to follow the rule heretofore announced in the many cases before our court as well as in other circuits, until a different rule is prescribed by statute or by the Supreme Court.

We are of the view that the findings of the Hearing Examiner, and of the Appeals Council are not sustained by substantial evidence. The conclusion of the Hearing Examiner that Congress expressly rejected a liberal construction of the disabiliity provision of the Social Security Act is, as heretofore said, clearly erroneous. Rather, the broad purpose of the Act requires a liberal construction in favor of disability if the same is reasonably made out. The holding that the weight to be accorded medical opinions is dependent on objective clinical findings is error. The holding that pain, no matter how severe, cannot be considered a disability in itself, is error.

In addition, the evidence of almost constant pain and disability on the part of appellee, his wife, and others, and the medical evidence can be said to be of overwhelming weight that appellee suffers from a herniated lumbar disc; that he is disabled from doing any work he formerly had done, and from any work of a substantial gainful nature; that while many of the physicians and surgeons in their written reports filed in this case state that surgery is recommended; that there should be surgery if disc disease is confirmed; that appellee should be encouraged to submit to surgery—the appellee's uncontradicted and unquestioned testimony is that no one ever told him he should submit to surgery, but that, rather, the Kentucky Rehabilitation Director told him when he asked to be admitted to a hospital that surgery would not do him any good, and there is no evidence that it would do him any good. The situation is similar to that in Jarvis v. Ribicoff, 312 F.2d 707, 710, 711 (C.A.6) in which this court said:

"The Hearing Examiner further found that * * * 'Dr. William C. Roland, an orthopedist, who examined the claimant on June 16, 1959, regards the claimant's condition to be remediable and recommended hospitalization.' There is no evidence that Dr. Roland regarded the claimant's condition to be remediable. Dr. Roland did say, as shown in his report heretofore quoted,

that the appellant was disabled for his regular occupation, and that hospitalization was recommended for the purpose of performing a lumbar myelogram and disc excision, if disc protrusion is demonstrated on the myelogram. This is far from saying that claimant's condition is remediable. Dr. Roland, in recommending disc excision, does not, according to his own report, know whether there is a disc protrusion. Does he say that, if there were not a disc protrusion, appellant, in his present condition, could engage in a substantial gainful activity? No. Does he say that if there were a disc protrusion, the excision of the disc would render appellant able to engage in a substantial gainful activity? No. In fact, the undisputed testimony of appellant is that Dr. Roland would not say 'whether it would do me any good or do me any harm.' "

 The evidence of the Vocational Counselor that appellee can make small toys or be a cloth cutter in the textile industry, or fabricate metal, is without weight, once it is acknowledged that appellee suffers pain whenever he bends, stoops, or lifts, and that he has a herniated disc in his lumbar spine which surgery would alleviate, as the Appeals Council found. "[It] is no answer that the claimant may be theoretically capable of performing some one of the * * * jobs contained in an exhaustive list covering places and circumstances utterly irrelevant to her situation." Thomas v. Celebrezze, 331 F.2d 541, 546 (C.A.4). All of the evidence must be said to indicate to a reasonable person that appellee suffers severe pain from his disability. But the Secretary insists that appellee, in his admittedly disabled condition, leave his home in the Kentucky mountains and travel 100 miles away to a city, with his wife and seven children, in order to perform substantial gainful employment in making toys or cutting cloth in the textile industry, since such *light* work cannot be found in the general area in which he lives—and appellee would not be entitled to disability benefits as long as he

could perform such work. "It is unrealistic to think that [employers] would hire anyone with the impairments of this claimant." Thomas v. Celebrezze, 331 F.2d 541, 546.

We are of the view that the decisions of the Hearing Examiner and of the Appeals Council constituted reversible error and that, in keeping with the many decisions of the courts to which reference has heretofore been made, the findings were not supported by substantial evidence but, rather, that the evidence discloses appellee was disabled from performing any substantial gainful employment.

In accordance with this opinion, the judgment of Judge H. CHURCH FORD, reversing the determination of the Secretary and remanding the case with directions to grant disability benefits, is affirmed.

O'SULLIVAN and PHILLIPS, Circuit Judges, concur in the result.