Juan **TORRES RODRIGUEZ**

v.

**SECRETARY OF HEALTH, EDUCA-TION AND WELFARE.**

**No. 618–68.**

United States District Court,
D. Puerto Rico.

July 14, 1970.

Pablo R. Cancio, Aguadilla, P. R., for plaintiff.

Candita R. Orlandi, Asst. U. S. Atty., San Juan, P. R., for defendant.

ORDER and MEMORANDUM OPINION

FERNANDEZ-BADILLO, District Judge.

This is one of those unusual Social Security cases in which the claimant was assisted by counsel during the administrative hearing. His application for disability insurance benefits filed on November 11, 1966 briefly set forth the alleged disabling impairment as one rendering claimant "unable to walk due to

leg difficulties." This initial assertion was subsequently broadened at the hearing where Torres, insisting that he "truly could not work any more," stated for the record that:

"* * * I want to tell you about my condition. These other medicines that I am using now for my back, for my legs, for my eyes, for my arthritis, that I cannot walk, I can't stand on my feet, and every day my pain is worse. I have to be in bed the majority of the time, I get shortness of breath, I cannot hear out of my right ear and I can't see out of my left eye" (Tr. p. 66).

The Hearing Examiner's adverse decision was adopted by the Appeals Council as the final decision of the Secretary of Health, Education and Welfare in this case. The Examiner's evaluation of applicant's physical condition is essentially contained in the following two paragraphs of his nine page opinion:

"Claimant's fractures to his arm, clavicle and tibia, his left inguinal hernia and rectal fistula abcess, must long have since healed, his osteoarthritic condition to the right knee and hip are nothing abnormal for a man of his age. The fact that his clavicle might be somewhat deformed is in no sense an impairment; *his fibromyositis may either be recurrent or have since disappeared.* The fracture of the right tibia in August 1966 was healing satisfactorily and in October 1966, he had been told to start gradual weight bearing on it, so that it is a matter of his own choice to use crutches but apparently he still refuses to give them up. This undoubtedly is the cause of any atrophy that may be present. *He might or might not have a herniated nucleus pulposus; if he does, it apparently is not severe because his own testimony indicates that he has refused surgery recommended for it."* (Emphasis supplied by the Court)

"All of claimant's impairments seem to be minimal except possibly for his back; even that condition has been relieved by treatment as late December 21, 1967, when the Veterans Administration (Exhibit 35) reported that he has been alleviated of his back condition when it also reported myalgia of the paravertebral muscles *secondary to muscle fatigue due to faulty posture.* (emphasis added). It would seem that better posture would improve this condition. The other diagnosis of parotiditis should long since have cleared it. X-rays of his spine were reported by the Veterans Administration, as essentially negative. The fact that he applied for veteran benefits more than a year ago and has not been reported as having been granted any, would likewise seem to indicate minimal impairments or that there is doubt concerning them." (Tr. p. 12)

Dr. Miguel Pérez Arzola [1] who served as medical adviser at the hearing answered questions made by the examiner concerning eleven different physical conditions for which claimant has been treated. However, upon examining the entire record which is comprised of testimony, reports and examinations, it is reasonable to conclude that plaintiff's major complaint is a back ailment which produces considerable pain. The uncertainty surrounding this ailment is apparent not only from that part of the Examiner's opinion quoted herein but also from the following questioning of Dr. Pérez Arzola by the Examiner:

"Q. Now, doctor, is there anything of significance in his [claimant's] testimony to tell you whether or not he does or does not have a herniated disc on the basis of the record, in the file, and on his testimony?

A. Well, there is a possibility he may have a herniated disc, but there is no definite proof that he has had it.

---

1. Dr. Pérez Arzola is an internist with subspecialty in cardiology.

Q. So that it might still be the fibromyositis which is still bothering him?

A. Could be." (Tr. p. 47)

This uncertainty is not cleared up even though ample medical evidence exists. In this, as in any Social Security claim, the four elements of proof to be taken into account and interrelated are: "(1) the objective medical facts, which are the clinical findings of treating or examining physicians divorced from their expert judgments or opinion as to the significance of these clinical findings, (2) the diagnoses, and expert medical opinions of the treating and examining physicians on subsidiary questions of fact, (3) the subjective evidence of pain and disability testified to by Claimant, * * * (4) Claimant's educational background, work history, and present age." Underwood v. Ribicoff, 298 F.2d 850, 851 (4th Cir., 1962). With respect to this particular individual we find a 50 year old man with sixth grade schooling and an I.Q. moving within the higher range of the dull normal category whose prior vocational background consists of jobs such as picking coffee, cutting sugar cane, loading and unloading trucks, and factory jobs performed in the mainland—cutting metal tubes, packing clothes, filling boxes with tobacco. He has been examined by numerous doctors and there are several diagnoses as to his back impairment. A hospital summary of the Veterans Administration, dated December 4, 1967 (Exhibit 35) reported him as being "alleviated of his back condition" upon discharge and listed "myalgia paravertebral muscles lumbar region secondary to muscle fatigue due to faulty posture" as the one diagnosis responsible for the major part of his stay. Radiographic examinations of the lumbar spine have been consistently negative (Tr. pp. 125, 128, 131, 138, 180). Neurological examinations by Dr. Max Ramírez de Arellano and Dr. As-drubal F. Arzola, orthopedic surgeon, revealed no neurological deficit. On June 6, 1967, Dr. Manuel Guzmán Acosta made an orthopedic evaluation of claimant and set forth his impressions as: (1) osteoarthritis right knee, (2) low back pain with ill defined evidence of radicular irritation, and (3) difficulties with left shoulder and right ankle, c. u. (cause unknown). Another orthopedic examination dated January 1, 1967 states that he suffers of fibromyositis of the lumbar paravertebral muscles.

Simultaneously with the negative X-rays of the lumbar spine and the normal neurological studies there is a repeated finding of a herniated nucleus pulposus. On May 23, 1967 Dr. Luis A. Sánchez certified that Juan Torres Rodríguez was hospitalized at the Professional Hospital "because of an herniated disc" (Tr. p. 127). A clinical record of the Bella Vista Hospital,[2] where he received treatment reports negative X-rays and negative laboratory findings but gives a final diagnosis of herniated nucleus pulposus and a poor prognosis for improvement "unless spinal surgery can help" (Tr. p. 128). Earlier reports of consultation from this same hospital, signed by Dr. Paul E. Kindy, sets forth a questionable diagnosis of H.N.P. (Tr. p. 130, 132).

Dr. Asdrubal F. Arzola, orthopedic surgeon, also reported negative X-rays of the lumbosacral spine and right knee on March 9, 1967 and stated that there were "subjective complaints of pain in the back and in the right leg without objective evidence of disease." He found considerable tenderness to pressure, subjective weakness throughout the right leg and marked subjective pain in motion of the knee. A similar finding of pain on pressure in the lumbar region was made by Dr. Pedro H. Ibarra on September 8, 1967.

2. This clinical record is signed by Dr. J. McCandless.

A month later plaintiff was examined by Dr. Andrés T. Oliver [3] who reached the following conclusion:

"The whole picture in this patient is misleading. There is history of multiple traumas and long periods of immovilization. There is subjective pain and weakness in lower extremities with a bizarre sensory loss. Possibilities are those of chronic fibromyositis with superimposed psychogenic somatizations vs. compression radicular syndrome (HNP). Even with a negative X-ray study, I would favor my first choice. However, only myelography or may be EMG will give a final impression" (Tr. p. 143).

There is an important piece of medical evidence which appears undated and consists of a report on a workshop evaluation at the Rehabilitation Center. He remained there for a week and was evaluated by a psychologist, a psychiatrist, two fisiatrists and an occupational expert. After interviewing Torres the Vocational Rehabilitation Counselor expressed that:

"The origin of this man's pain seems to have a phisiological cause. The degree of pain felt in his interpretation and this varies from one person to another being determined by his personality components and his cultural heritage. Nevertheless the degree of pain as interpreted is real and handicapping.

This man may be remotivated toward the type of work just explained [simple tasks from some factory or home piece work basis] if a rehabilitation plan is initiated shortly after he start receiving a compensation". (Tr. p. 146).

The psychologist, Dr. Héctor A. Puig, believed that claimant was not mentally incompetent and observed that "disability in this case ought to rest upon the medical findings since at the psychological level we do not think that the client is severely impaired to engage in substantial gainful activities." The psychi-atric evaluation by Dr. Roberto Fumero resulted in a diagnosis of a "depressive reaction—chronic manifested by somatization and deterioration of his personality and probable tendency toward tissue degeneration." He reported a poor prognosis: schizoid personality. Dr. Mercedes Stefani, fisiatrist, reported findings of "'marked spasm, tenderness lumbar paravertebral muscles. Tender L-4 L5 + L5 S 1, in interspace, S. L. R. 50°bilateraly * * * no evidence of muscle atrophy." Her impressions were:

1) Chronic fibromyositis of lumbar paravertebral muscles
2) Probable weakness right lower extremity secondary to disuse
3) R/O H.N.P. lumbar

Dr. Ramón Santini, also a fisiatrist, indicated that the pain on straight leg raising at 50°, the numbness and decreased motion of the trunk, the muscle spasm all pointed toward "organic in lumbar spine". He placed work restrictions and discarded situations requiring too much trunk bending, weight lifting and prolonged periods of walking, especially in rough terrain. He is the only physician who commented on work situations after examining claimant.

There is a report of contact of December 8, 1967 signed by Dr. Luis M. Polo, professor of psychiatry at the University of Puerto Rico School of Medicine, stating that Juan Torres was suffering from a chronic depressive reaction with gradual deterioration of his personality. An identical observation was made by psychiatrist Fumero during the workshop evaluation. Dr. Polo concluded that, notwithstanding the difficulty of ascertaining the degree of deterioration, "if we take into account the many accidents this patient has suffered, his present emotional state, his limited schooling, his low intelligence, his many somatic complaints, it is unlikely that he can at present engage in substantial gainful activity."

There are two medical certifications vouching for claimant's disability. One

3. No information was available on this physician's professional qualifications.

The letterhead of his medical report states that he is a neuro-psychiatrist.

was issued by Dr. Juan Avilés, surgeon, who stated that he treated Juan Torres Rodríguez from 1946–1947 for pain in the lumbar region, that he now suffers of generalized arthritis and his condition is progressive. Dr. José H. Colón certified that claimant had "been under medical treatment for disc syndrome for several occasions during last two years. In my opinion patient can't work."

The brief summary set forth herein fairly accounts for the medical evidence compiled. An accurate statement concerning medical data in disability claims is found in Underwood,[4] supra, where the Court said at page 851:

"* * * The objective medical findings may show more or less clearly the existence of certain clinically determinable physical or mental impairment. However, a recitation of objective, clinical findings will seldom show, without more, the over-all effect of these impairments on a particular individual. This is a matter of medical judgment to be decided with reference to the individual's general physical condition and the state of development of each of the defects. The expert medical opinion of treating or examining physicians on these subsidiary questions of fact will in most cases be essential in determining with respect to a particular individual the severity of an objectively determinable physical impairment."

The Court, noting that orthopedic defects [5] are "notorious in medical circles for difficulty of clinical proof", went on to hold that "the Referee gave inadequate consideration to the tie-in between [the] objective findings and the subjective evidence of severe radiating pains in the back and inability to withstand slight exertion because of them."

Such subjective complaints are extremely similiar to those repeatedly made by claimant in this case. Pain seems to be the cardinal sign of his ailment. The case of Griffin v. Finch, 303 F.Supp. 162, 166 (D.C.S.C., 1969) which cites Underwood, supra, with approval, recognizes the presence and significance of pain in back conditions in the following passage:

"The evidence of the extent of plaintiff's pain and suffering is certainly relevant in determining whether her impairment placed her under a disability. Common experience dictates that back conditions are extremely difficult to diagnose and moreover it is almost impossible to determine the amount of pain generated by a particular condition. Pain is outside the realm of objective scientific measurement; it cannot be diagnosed and calibrated by laboratory and clinical procedures. Evidence of pain, of necessity, must be subjective and, for that reason, the higher courts wisely directed that subjective evidence of pain be considered in disability determinations. This is particularly true when a back condition is involved."

It is readily seen from the record that plaintiff has a back ailment. No one has any doubt about this. The problem is that a definite diagnosis has not been given and the degree of severity has likewise not been established. A possible diagnosis of herniated nucleus pulposus is found time and again, along with one of chronic fisiomyositis, in the record. A myelogram, the method which would permit reaching a diagnosis of herniated nucleus pulposus should such condition exist, has not been performed upon claimant. The Examiner categorically stated so but affirmed that "apparently the claimant refused it when he refused the operation" (Tr. p. 51) so there was no sense in giving one. The medical adviser, however, testified that he agreed with Dr. Oliver's report to the effect that "only a myelography or may-

---

4. As aforestated, the Court recognized the "obvious interrelation" of the four elements of proof cited therein, to wit: objective medical findings, expert medical opinions and diagnoses, subjective evidence and personal data.

5. Underwood was allegedly suffering of a disc condition among other physical troubles.

be EMG will give a final impression" (Tr. p. 51).

The Examiner indicated in his decision that plaintiff "might or might not have a herniated nucleus pulposus; if he does, it apparently is not severe because his own testimony indicates that he has refused surgery recommended for it" (Tr. p. 12). It is not disputed that on a given occasion Torres Rodríguez refused disc surgery. However, it is also true that there is no final diagnosis of a herniated disc and although some physicians have opined otherwise a myelogram, which would help to clear up this nebulose, has not been done for some unknown reason. The examiner, nonetheless, concluded that he fell short of the level of severity because of his refusal of surgery for a condition that he "might or might not have." This is too serious a condition to brush aside so lightly. This situation reminds me of a similiar one censored by Senior Circuit Judge McAllister in his extensive opinion in Davidson v. Gardner, 370 F.2d 803, on page 812 (6th Cir., 1966) where he states:

"The Appeals Council was not sure what caused appellee's impairment, but held that *'although it is not absolutely certain that the claimant has a lumbar disc protrusion, surgical intervention would correct this condition if confirmed.'* (Emphasis supplied.) There was expert evidence also that appellee might require a spinal fusion. Everyone knows that a surgical operation to correct a lumbar disc protrusion, or for a spinal fusion, is a serious and painful and, often, a dangerous operation. If appellee did not

have a lumbar disc protrusion, implicitly surgery would not be necessary, and would not correct his impairment. Not knowing whether he had a lumbar disc protrusion or not, the Appeals Council decided to deny appellee disability benefits, if he did not undergo a serious operation for an impairment that he may not have been suffering from at all, on the ground that regardless of the cause of his impairment, he should submit to an operation for an ailment they guessed that he might have."

It is settled law that a disability determination involves two steps: *first,* the establishment of a physical or mental impairment, and, *second,* said impairment must be so severe that it precludes the person from engaging in activity that is both substantial and gainful. To support a disability denial evidence must be received on material factual issues and the findings of fact must resolve the crucial factual issues. Weaver v. Finch, 306 F.Supp. 1185, 1191 (W. D.Mo., 1969). The record in this case reveals that there must be a determination or express finding on whether claimant is suffering from herniation of the nucleus pulposus. A myelogram would demonstrate if such a condition exists. There is no evidence that claimant has refused this diagnostic procedure. If such a back condition should be demonstrated, a finding of severity[6] and the feasibility of an operation must be considered. Operation for removal of a nucleus pulposus is major surgery indeed.[7]

---

6. The following portion of the Examiner's inquiry of Dr. Pérez Arzola reveals that a consideration of the level of severity was once more done away with by the familiar statement "he might or might not have a disc:"
"Q. Now then, doctor, the mere fact of having a herniated disc would that necessarily mean a man can't work?
A. No, sir.
Q. If you had a patient in the claimant's condition would you stop him from working?

A. It all depends on the severity, as I said before.
Q. Well, on the basis of the findings we have in the record so far, that he might or might not have a disc * * *"
(Tr. p. 61)

7. This is confirmed by the medical adviser's testimony when questioned by plaintiff's attorney at the hearing:
"Q. You think there could be any improvement after surgery?
A. It is possible that you might get

Finally, the tie-in of objective evidence and subjective evidence of pain spoken of in *Underwood, supra,* must be ever present. Of course, objective medical evidence is of utmost importance in the establishment of a disability in accordance with Social Security requirements. However, subjective evidence is a significant factor, especially in cases such as this where the alleged impairment is the cause of constant pain. Severe back conditions are typified by the presence of pain.

Accordingly, the Court finds that there does not exist substantial evidence to support the Secretary's findings and hereby remands this case for reconsideration in accordance with this opinion and for further investigation to include the performance of a myelogram upon claimant.

It is so ordered.

improvement if you have a disc and you get operated on, if you have a disc and you are operated on you have about a 50% chance of improvement, for definite improvement, 25% of a slight and 25% of failure, so actually this is not a panacea for this condition.

Q. You say you would only have 50%?

A. Of deninite improvement, 25% of slight and 25% of failure.

Q. If it fails, what would be the result?

A. Well, a patient might be aggravated actually.

Q. He could stay like that for two or three years after that, stay in bed?

A. Not usually, after a few months he might be able to walk again with difficulties, but with definite aggravation, because you have nerves and you have discs and muscles there and you might develop worsening of the condition" (Tr. p. 61).