**Fred BOYD, Appellant,**

**v.**

**John W. GARDNER, Secretary of Health, Education and Welfare, Appellee.**

**No. 11014.**

United States Court of Appeals
Fourth Circuit.

Submitted March 7, 1967.

Decided April 4, 1967.

---

Fred O. Blue, Bluefield, W. Va., and T. G. Shufflebarger, Richlands, Va., on brief, for appellant.

William C. Breckinridge, Asst. U. S. Atty., on brief, for appellee.

Before SOBELOFF and CRAVEN, Circuit Judges, and HARVEY, District Judge.

SOBELOFF, Circuit Judge:

Appellant, Fred Boyd, applied on August 3, 1964, for disability insurance benefits under Sections 216(i) and 223 (a) of the Social Security Act, 42 U.S.C. §§ 416(i) and 423(a) (1958). His claim was denied by the Hearing Examiner, and this action was affirmed by the Appeals Council. On petition for review, the District Court for the Western District of Virginia granted the Secretary's motion for summary judgment, on the ground that there was substantial evidence to support the Department's position that although the claimant could not return to heavy labor, he had failed to establish that he was so severely impaired as to be unable to engage "in any substantial gainful activity."

The claimant was born in 1921 in Buchanan County, Virginia. He has never received any formal schooling and is totally illiterate. His verbal I.Q., when tested, equalled 70, and a psychiatrist found him to be in the "moderate range of mental deficiency." At the time of the Hearing Examiner's report, Boyd was living with his wife and nine of his twelve children, who ranged in age from 22 years to 18 months. In his early years, he worked on his father's fifteen-acre farm at such chores as hoeing, plowing with a mule, feeding chickens, and gathering eggs. He has, however, had no experience whatever with farm machinery. At the age of 19, he went to work in the coal mines hand

loading coal. His only other work experience during the approximately twenty years spent in the mining industry was in drilling, blasting, and timbering, none of which can be termed "skilled" labor. He has never served in the armed forces.

In 1961, as a result of a mine accident in which his back was broken, Boyd was hospitalized for nine days and then discharged in a body cast and confined to bed at home for nine weeks. Subsequently, he wore a back brace for an undisclosed period. He was absent from work for about seven months after the accident, and claims that when he returned, he was unable to maintain a regular working schedule because of pain in his lower back. He has not worked since March, 1964.

The medical evidence, based on x-ray reports and on information furnished by six doctors who examined the claimant between March, 1964 and December of that year, shows that in addition to the claimant's persistent subjective complaints of pain in his back and arms,[1] there were objective findings of the narrowing of the second lumbar vertebra due to the compression fracture suffered by the claimant in 1961, associated with myositis (inflammation) about the lumbar muscles, some minor osteoarthritis (a chronic multiple degenerative joint disease), chronic low back strain, chronic bronchitis, and enlarging of the finger joints.

In addition to his physical disabilities, claimant was diagnosed by a specialist in neuropsychiatry as having "a psychoneurotic disorder with somatic conversion symptoms" sufficient to classify Boyd as "in the moderate range of psychiatric disability." The psychiatrist noted that Boyd's "memory and recall functions were only fair, his judgment was poor, and his basic adjustment with other people somewhat inadequate and inept."

The examining physicians concluded that the claimant was unable to undertake hard manual labor, but thought that he could perform "some light work which did not require stooping or bending"— although one stated flatly that Boyd was "unable to do gainful employment," and another cautiously qualified his conclusion with the suggestion that *"with treatment * * * eventually* he should be able to return to some type of lighter work."

The record discloses, however, that the Hearing Examiner relied almost exclusively on the opinion of a general surgeon. It is not unfair to say that Dr. Olwine's report exhibited a somewhat hostile attitude toward claimant. Having examined Boyd at the request of the state Division of Rehabilitation, he reported that "quite frankly I get the impression that he enjoys receiving welfare and doesn't care whether he ever works again or not," and that "due to this man's mental attitude I have my doubts if he will ever do much work again."[2] Despite this condemnatory attitude toward the claimant, the surgeon's prognosis was not that Boyd could undertake heavy manual labor, but that he should be able to perform some *light work* "which does not require stooping over in the mines that had been his livelihood since he first began work."

The Hearing Examiner also mistakenly attributed an adverse significance to statements of the examining psychiatrist that claimant's "motivation to improve his current level of function or to im-

[1] The claimant testified that his back "pains all the time," that he suffered almost constant pain in his arms and hands and under the popliteal (the posterior surface of the knee) area of the legs, that his wife and children had to bring in the water and coal and work the vegetable garden, that he did some walking around the house each day, that he had no outside activities, and did no visit-ing. He further testified that he was unable to sit longer than three hours because of his back pain, and for the same reason, could not drive more than an hour at a time.

[2] He also commented that "when walking while observed the man has a considerable stoop at the waist, but when he walks when he thinks he is not being observed he walks fairly erect."

prove his conditions in life remain rather poor," and that Boyd "won't change much, his motivation to improve himself is certainly not great and I think he will continue to rely on other people for help, care and assistance." This is like the situation in Lippert v. Ribicoff, 215 F. Supp. 28 (N.D.Calif.1963),[3] where the Examiner put reliance on a medical report, which included the statement that the claimant's *"lack of motivation* will probably interfere with his performing adequately in any position in which he is placed," to support a finding of no disability. This was condemned by the court, which declared that

> "the law compels [the conclusion] that such medical evidence is more proof of disability rather than the contrary. As was stated in Ollis v. Ribicoff (W.D.N.C.1962), 208 F.Supp. 644, at 648, plaintiff's 'physical and *mental* capacity to resist or adapt' to his impairments is a 'proper basis for evidentiary inferences on these matters. Underwood v. Ribicoff, supra.' "

215 F.Supp. at 34. In the present case, the Hearing Examiner found the diagnosed psychiatric disability "not, in any sense of the word, truly disabling," because although Boyd tested in the moderate range of mental deficiency, the Examiner felt that claimant's

> "lack of education and of a high intelligence level was no handicap to his working before he had the back accident, and, in view of the minimal na-

3. Quoted with approval in Davidson v. Gardner, 370 F.2d 803, 825 (6th Cir. 1966).

4. "Once the applicant for disability benefits has offered evidence of the work he has done, and his inability to do *that kind of work* any longer, the burden is upon the Secretary to show that he can do some work of a substantial gainful nature."
Davidson v. Gardner, 370 F.2d 803, 823 (6th Cir. 1966). (Emphasis supplied.) See also Lackey v. Celebrezze, 349 F.2d 76, 79 (4th Cir. 1965); Ray v. Celebrezze, 340 F.2d 556, 559 (4th Cir. 1965); Jarvis v. Ribicoff, 312 F.2d 707, 710 (6th Cir. 1963).

ture of his back difficulties, should be no obstacle at the present time."

In light of the fact that prior to his back injury, the claimant was doing unskilled heavy manual labor, which all the examining physicians agree he is no longer able to do, it does not appear to be relevant that Boyd was not "handicapped" by a lack of education *before* his accident.

■ Since it is conceded that Boyd is no longer capable of doing heavy manual labor in the mines—the only kind of work he ever did in the past—it is incumbent upon the Secretary to show that there are other kinds of work *actually* available, for which a man with the claimant's impairments may be considered reasonably suited.[4] In an attempt to meet this burden, the testimony of Dr. Karl F. Heiser, a Ph.D. in psychology and a specialist in vocational counseling, was introduced. Having first referred to the all too familiar U. S. Dictionary of Occupational Titles, Dr. Heiser testified that in his opinion there were a number of jobs classified as light or sedentary, which do not require heavy lifting, or rapid frequent bending, or stooping, that a person similar to the claimant in age, education, physical and mental impairments, prior working experience, and mode of life could perform.[5] At no point in his testimony, however, did Dr. Heiser evaluate the skills and movements necessary for the occupations he listed, or show that the skills possessed by Boyd are transferable

5. Among the "light jobs" Dr. Heiser listed as suitable are: in the wood-working industry—spindle sander, lathe sander, mounter, nail puller, tongue and groove machine operator, and croze-machine operator; in the paper and pulp industry—apron operator, hand slicer, punch press operator helper, jogger, and lay boy tender; in the slaughtering and packing industry—viscera washer and snout puller; in the tobacco industry—cigar cellophaner, bundler, cigar packer, coolercatcher, tobacco scrap sifter and tobacco racker.

to such jobs.[6] Gardner v. Earnest, 371 F.2d 606 (4th Cir. 1967); Davidson v. Gardner, 370 F.2d 803, 826 (6th Cir. 1966).

The examining psychiatrist—not to be confused with the psychologist-vocational consultant—stated in his report that Boyd "has had no experience with the pencil," "cannot even sign his name," and "has trouble doing simulated purchases from the store." With such limitations, it is difficult to imagine for what type of light work he could possibly qualify. The government notes in its brief that the claimant is able to tell time and count money. It seems to us these "skills," if indeed he actually possessed them, can hardly be thought to equip him for functioning in a substantially gainful activity in the world of today.

■ Invoking the Census Report and directories showing employment in industries in various states, the vocational consultant then testified as to where such jobs might be found:

"Well, the woodworking industry is throughout this area of the country. And in Kentucky there are 62 companies of [sic] the median number of employees per company is 20. In Eastern Tennessee and Western Virginia, there are many woodworking companies, but I don't have those directories with me and I can't specify the number. The tobacco industry starts at the Tri-City area and goes on south into North Carolina. Or you can find these same jobs in the Lexington-Frankfurt to Louisville area in Kentucky. The slaughtering industry is throughout this part of the country. Kentucky has 72 slaughtering plants in which you find a variety of these jobs. Now, paper and pulp is a large industry at the southern part of Virginia and northeastern Tennessee and Western North Carolina; the Tri-City area has many wood pulp industries with paper work."

The claimant resides in Buchanan County, in the heart of the mountain region of Virginia, remote from any industrial area, and without public transportation or modern access routes to such areas. It is unrealistic to expect this particular claimant, having a wife and nine children, to offer his services as far away as Louisville, Kentucky (over 200 miles from Boyd's residence) or some unspecified point in North Carolina, on no more than the speculative chance of employment suggested by the witness. The area described by Dr. Heiser in which a variety of light, unskilled jobs is theoretically available includes the width of the state of Tennessee, the entire states of North Carolina and Kentucky, and western and southern Virginia, and thus extends considerably further than the 150 miles found "wholly impractical" in Cooke v. Celebrezze, 365 F.2d 425 (4th Cir. 1966).[7] This broad geographic area

6. The only enlightenment provided by the witness concerning the enumerated jobs was in response to the Hearing Examiner's inquiry as to the nature of a "snout puller's" duties:
"Q. What does a Snout Puller do, Doctor?
A. He works in a slaughtering house where they dissect animals, and, uh— they, uh—actually pull the snouts from the carcass and throw them aside."

7. It is noteworthy that the claimant in the Cooke case resided in Wyoming County, West Virginia, which is separated from the residence of the present claimant by only one county. Cooke also suffered from a back condition, resulting from a mine accident, which was diagnosed as a "chronic lumbosacral de-

rangement, chronic lumbar strain, and lumbar arthritis." As with Boyd, Cooke's examining physicians recommended that he refrain from jobs involving heavy lifting, bending, or stooping. Cooke was 37 years old at the date of his application for disability benefits, possessed an eighth grade education, and was said by doctors to be able to engage in some form of light work. Yet, after assisting Cooke over a five-year period in his search for a job, the state Rehabilitation Division was of the opinion that he could not be retrained for other employment "due to the extent of his disability and his educational limitations." Surely the claimant in the present case, with similar physical disabilities, but with his mental deficiency and no education, is an even

cannot, by any realistic measure, be considered "a reasonably accessible labor market" for this claimant. Wimmer v. Celebrezze, 355 F.2d 289, 294 (4th Cir. 1966).

■ Merely having a vocational consultant read from a book that in the state of Kentucky there are 72 slaughtering plants or 62 woodworking companies in which some of the jobs listed in the U. S. Dictionary of Occupational Titles could be found, does not suffice to meet the Secretary's burden of showing that "types of work within the background and residual capacities of the claimant exist within this area."[8] Nothing in the record indicates that either Dr. Heiser or the Examiner determined whether the listed jobs were available in the vicinity of Boyd's residence, and, more importantly, whether a man with this particular claimant's handicaps was employable. See Gardner v. Earnest, 371 F.2d 606, passim (4th Cir. 1967) and cases cited therein. "Availability of jobs for disabled workers means opportunity for jobs for disabled workers."[9] Davidson v. Gardner, 370 F.2d 803, 827 (6th Cir. 1966). While we are fully advertent to the fact that we deal here with a statute for disability benefits and not for unemployment compensation, it must not be overlooked that in a depressed area like Appalachia, where the demand for jobs is far in excess of the supply, even able bodied men of normal intelligence and a modicum of education experience difficulty in securing employment. Hence, Boyd, who not only is physically disabled, but suffers the additional handicaps of no education, no training, low and impaired mentality, would, as a practical matter, not be considered by employers. Even were this an area of "full employment," it is apparent that Boyd would remain unemployed, since one afflicted with his cumulative impairments lacks the marketable skills required for substantial gainful employment. The inquiry must therefore be what are the "economic realities" in the general area in which claimant lives, for persons with his combination of disabilities. Seldomridge v. Celebrezze, 238 F. Supp. 610, 618 (E.D.Pa.1964).

■ On the record as a whole, we think the District Court was in error in holding that there was substantial evidence to sustain the Secretary's finding. The case will be remanded to the District Court for entry of judgment for the claimant.

Reversed and remanded.

less likely candidate for employment in the same general labor market where Cooke unsuccessfully sought a job for so long. Similarly, in Thomas v. Celebreeze, 331 F.2d 541 (4th Cir. 1964), where the claimant was incapable of returning to her old job, it was held that "her age, limited education and restricted work history lead to the conclusion that the prospects for retraining and employment are nonexistent." Id. at 546.

8. Wimmer v. Celebrezze, 355 F.2d 289, 294 (4th Cir. 1966).

9. "[A]lthough such jobs might *exist* in that area, this is not to to say that they are '*available*' to a man in Cooke's condition. It is a matter of common knowledge that employers are hesitant to hire the handicapped, particularly if they have no special skills. The prospective employer's fear of absenteeism, the possibility of higher workmen's compensation premiums, and uncertainty whether such an employee will be able to perform his work satisfactorily, are factors militating against the abstract judgment that jobs are available to this man."

Cooke v. Celebrezze, 365 F.2d 425, 428 (4th Cir. 1966). (Emphasis in original.)

In Hayes v. Gardner, 376 F.2d 517 (4th Cir. 1967), this court held that the District Judge was in error in finding substantial evidence to support the Secretary's denial of claimant's application because there was

"no factual basis to support a reasonable inference that employers would be willing to employ a person with claimant's impairments. Abstract forecasts of employment are insufficient."

Id. at 521. As in *Hayes*, in this case there was no attempt by field investigations to lay a foundation for a showing that local employers would hire persons with impairments as pronounced as the claimant's; there was only a speculation based on thin air by an overuse and misuse of census reports and The Dictionary of Occupational Titles.