**Basil CONRAD**

v.

**F. David MATHEWS, etc.**

**Civ. No. W–74–944.**

United States District Court,
D. Maryland.

July 15, 1977.

844

James J. Lyko, Susan P. Leviton, and The Legal Aid Bureau, Baltimore, Md., for plaintiff.

Jervis S. Finney, U. S. Atty., and John W. Sheldon, Asst. U. S. Atty., Baltimore, Md., Diane C. Moskal, Dept. of H. E. W., Philadelphia, Pa., for defendant.

WATKINS, Senior District Judge.

Plaintiff, Basil Conrad, applied on September 13, 1971, for black lung benefits under the Federal Coal Mine Health and Safety Act. His application was denied initially, upon reexamination under the 1972 amendments and upon reconsideration. At a *de novo* hearing before an administrative law judge (ALJ), Plaintiff was not represented by counsel. The ALJ's decision holding claimant not entitled to benefits became final when the Appeals Council of the Social Security Administration denied Conrad's request for review. Plaintiff then appealed to this Court. The case was remanded to the Secretary for a new administrative hearing and for consideration of new evidence, including evidence from Dr. Louis Olsen, Conrad's treating physician. After the second hearing, the ALJ recommended Plaintiff be given black lung benefits. The Appeals Council rejected the ALJ's decision and issued a final administrative decision denying the claim. The case is now before this Court a second time. Both Conrad and the Secretary have moved for a summary judgment; Conrad has moved in the alternative for a remand.

*Statement of the Facts*

*Work Experience:*

Plaintiff is sixty-one years old and has an eighth grade education. He began work in the coal mines as a coal loader in 1934. In approximately 1935 Conrad was in an auto accident which resulted in the amputation of his left arm. The following year he returned to work in the mines on a tipple dumping coal. He was also employed for eleven years in the mines operating a motor, a job which he analogized to running a streetcar. Tr. 23–25. It is unclear how long Conrad worked in the mines during the period from 1936 to 1941. Tr. 23–24.

Social Security records show Conrad was employed in the mines all or part of each year from 1941 to 1954 and from 1958 to 1961. Tr. 47–51. Plaintiff left work in the mines in 1961 when the mine closed down. Thus, he appears to have worked at least fifteen years in the mines[1] and may have worked up to twenty-two years in such employment. A letter from the Bethlehem Steel pension plan dated December 1, 1963, states that Conrad had twenty-one years two months continuous service with the company, entirely in coal mines. Tr. 127; *Plaintiff's Brief*, filed July 6, 1976 (hereinafter *Plaintiff's Brief # 2*), at 3. After 1961, Conrad worked as a gas station attendant for five years pumping gas (but doing no repair work) at a station where business was slow. Tr. 25–26. He was then employed as a janitor until 1972 when he quit because he could no longer do the work required. At the first hearing, Conrad testified that he left the janitorial position because he was unable to handle the floor buffer with only one arm. At the second hearing he added that he was too slow in his work due to his respiratory problems. Conrad has not worked since 1972; his wife's earnings were his sole means of support from that time until July, 1974. Since then he has received a monthly miner's pension of $200.00 a month.

*Medical Evidence:*

On October 18, 1971, Plaintiff's first chest x-ray was taken. It was read by radiologist Dr. Walter Kilby (Tr. 56–57), who found "[s]light pulmonary emphysema, bilateral. Tortuous and sclerotic aorta. Tiny calcium deposits at the left base. Old healed fractures of the left clavicle and the left 6th rib. No evidence of pneumoconiosis. Category 0." Tr. 56; *Plaintiff's Brief*, filed February 21, 1975 (hereinafter *Plaintiff's Brief # 1*), at 4. The same x-ray was reread by Dr. Benjamin Felson who also found no pneumoconiosis. Tr. 124–25. A second chest x-ray of January 10, 1975, was interpreted by Dr. H. B. Copeland, radiologist, to show Conrad's lungs to be mildly emphysematous throughout. Tr. 129; *Defendant's Supplement to Brief*, filed September 1, 1976 (hereinafter *Defendant's Brief # 2*), at 2. A March 23, 1973 physical examination of the Plaintiff by Dr. Bernard S. Karpers, Jr., an internist specializing in pulmonary disease, indicated persistent cough for at least ten years productive of phlegm. Tr. 65–66.[2] Conrad also complained of shortness of breath on walking. The diagnosis at that time was "Chronic Bronchitis, Mild." The doctor notes that "environmental conditions of mining may cause increase in symptoms." Tr. 65–66; *Plaintiff's Brief # 1*, at 4. The examination revealed lungs clear on auscultation at rest, with a few rhonchi in the right lower lobe with hyperventilation. Tr. 65; *Defendant's Brief*, filed March 14, 1975 (hereinafter *Defendant's Brief # 1*), at 3–4.

Conrad has taken two pulmonary function tests. The first was administered at North Charles General Hospital on December 29, 1972. Tr. 58–61. At that time he had a history of smoking for thirty-five years and no heart condition. Without bronchodilation Conrad had a vital capacity of 2.9 liters (63% of predicted volume), a one second forced expiration volume ($FEV_1$) of 2.2 liters (76% of vital capacity), and a maximum breathing capacity (MVV) of 89 liters per minute (58% of predicted volume). After the use of bronchodilators, Conrad's vital capacity was 3.8 liters, $FEV_1$ was 2.8 liters, and his MVV was 96 liters per minute. Tr. 58; *Plaintiff's Brief # 1*, at 4. His height is 71 inches. Dr. Sheldon Goldgier, internist, the administering physician, noted that the results before the use of bronchodilators were mildly abnormal; after bronchodilation Conrad showed "good improvement although part of this may be

---

**1.** The length of time necessary to fall within the scope of the interim regulations. *See* pp. 847–848 *infra*.

**2.** The amount of phlegm has decreased since Conrad stopped smoking cigarettes and switched to cigars on doctor's orders. Tr. 118.

'training' effect." Tr. 58. The report and tracings were reviewed by Dr. Samuel Rubin who pronounced them acceptable for claims adjudication. Tr. 63–64.

A second pulmonary function test, administered at Franklin Square Hospital on February 11, 1975 (Tr. 130–31), but submitted without tracings, shows about 3.3 liters for $FEV_1$, and 128 liters per minute for MVV before bronchodilation, with values slightly lower after bronchodilation. Dr. N. L. Horwitz interpreted these results as showing "mild obstructive ventilatory defect with no response to the administration of nebulized bronchodilators. Arterial blood gases at rest prior to bronchodilation reveal normal oxygenation with mild respiratory alkalosis breathing air." Tr. 130; *Plaintiff's Brief* # 2, at 4. At his second hearing, Conrad testified that he felt he was doing his best during the two pulmonary function tests, stating: "I wasn't trying to fake nothing." When asked whether he had any difficulty in understanding the test, he replied that he just did what he was told to do. Tr.108. He further testified that he had no difficulty performing the test.

On January 10, 1975, Plaintiff was treated at Franklin Square Hospital for an attack of shortness of breath. The discharge summary diagnosis from this treatment stated that Conrad had "chronic obstructive pulmonary disease, emphysema and accidental neuropathy." Tr. 128; *Plaintiff's Brief* # 2, at 4.

Dr. John V. Conway submitted a statement dated August 1, 1974, indicating that he treated Plaintiff in the past. His examination revealed pulmonary emphysema which "may be on the basis of pneumoconiosis associated with coal mining." Tr. 134; *Plaintiff's Brief* # 2, at 4.

Conrad is presently under the care of Dr. Louis O. Olsen, internist. Tr. 135; *Defendant's Brief* # 1, at 4. He is being treated for "*Black Lung*" and attendant pulmonary disease." *See* Tr. 71 (no specific details given as to the basis for this diagnosis). A letter or report from Dr. Olsen dated January 18, 1975, stated that Conrad, his patient since May, 1970, "has had moderately severe pulmonary symptoms consisting of shortness of breath with slightest exertion, [morning] coughing productive of copious amounts of mucous . . . and some evidence of chronic bronchitis." Tr. 126; *Plaintiff's Brief* # 2, at 3. Dr. Olsen also noted that "[j]obs with daily lifting, climbing, extensive walking, etc. would not have been in [Conrad's] best interests." Tr. 126; *Plaintiff's Brief* # 2, at 3; *Defendant's Brief* # 2, at 3. In an earlier letter, dated August 21, 1974, Dr. Olsen wrote that Conrad has had a long history of "chronic obstructive lung disease manifest by changes in his thoracic cage and positive lung findings on examination." Tr. 135; *Plaintiff's Brief* # 2, at 3; *Defendant's Brief* # 2, at 2. He added that a chest x-ray taken in May, 1974, showed Conrad's lungs essentially clear "except for a few small left lower lobe calcifications." *Defendant's Brief* # 2, at 2–3. Dr. Olsen further indicated that Plaintiff had frequent pulmonary infections and shortness of breath which seemed to be aggravated by any sort of physical exertion. *Defendant's Brief* # 2, at 3; *Plaintiff's Brief* # 2, at 4. Conrad's pulmonary infections have required medication, but he is on no daily maintenance medication. Tr. 135.

In other testimony as to Conrad's condition, John Matthai, a neighbor, noticed Plaintiff does not walk "as much as he used to" and has curtailed many of his outside activities. Tr. 32. Conrad's son-in-law, Buford Riggleman, stated that Conrad is short of breath and, although he tries to mow the lawn, Mr. Riggleman usually does it for him. Tr. 123. He also remarked that Plaintiff's condition has worsened over the last few years.

Conrad, himself, testified that he becomes short of breath when he walks, suffers from chest pains, cannot sleep at night (he did not mention the reason for this difficulty), and takes medicine to relieve his shortness of breath. He stated that he could breathe

better outside and that he has had to restrict his daily activities. Conrad said that he had had no difficulty performing his mine work, had no breathing problem in the mines, had not been absent from his mine work due to his breathing, and had developed his breathing problem about ten years ago. In addition, he felt his condition was deteriorating.[3]

*Issue* :

The only issue before this Court is whether the Secretary's decision to deny Conrad's application for black lung benefits is supported by substantial evidence.

*Discussion* :

■ Under § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), incorporated by Section 413(b) of the Federal Coal Mine Health and Safety Act, 30 U.S.C. § 923(b), this Court is limited to substantial evidence review of the Secretary's decision. The Court may not try the case *de novo*. Substantial evidence has been defined as

> "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. [National] Labor [Relations] Board*, 305 U.S. 197, 299 [59 S.Ct. 206, 217, 83 L.Ed. 126] . . . "[I]t must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." *[National] Labor [Relations] Board v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300, [59 S.Ct. 501, 505, 83 L.Ed. 660].

*Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951); *see also Oppenheim v. Finch*, 495 F.2d 396, 397 (4 Cir. 1974); *Blalock v. Richardson*, 483 F.2d 773, 775 (4 Cir. 1972); *Putzek v. Mathews*, Civil No. HM–75–326, slip op. at 2 (D.Md., September 21, 1976).

■ To qualify for black lung benefits, Plaintiff must establish that he was a miner, that he is totally disabled due to pneumoconiosis which arose out of employment in the Nation's coal mines, and that he has ·filed a claim for benefits in accordance with the provisions of 20 C.F.R. §§ 410.220 to 410.234. The Secretary acknowledges that Conrad has satisfied the first and third of these requirements but contends that he has failed to satisfy the second. *Defendant's Brief* # 1, at 6. Pneumoconiosis is defined as "a chronic dust disease of the lung arising out of employment in a coal mine." 30 U.S.C. § 902(b). A miner is considered totally disabled due to pneumoconiosis if:

> (1) His pneumoconiosis prevents him from engaging in gainful work in the immediate area of his residence requiring the skills and abilities comparable to those of any work in a mine or mines in which he previously engaged with some regularity and over a substantial period of time . . .; and

> (2) His impairment can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than 12 months.

20 C.F.R. § 410.412(a). Plaintiff can attempt to establish entitlement to black lung benefits under either the interim adjudicatory rules or the permanent regulations.

#### A. *Interim Adjudicatory Rules*

The interim adjudicatory rules apply to specified claims filed by a miner before July 1, 1973; Conrad's claim was filed September 13, 1971. Under these provisions, a rebuttable presumption of total disability due to pneumoconiosis arises if either (i) a chest x-ray, biopsy or autopsy established pneumoconiosis (20 C.F.R. § 410.428); or (ii) in the case of a miner employed at least fifteen years in underground or comparable coal mine work, ventilatory studies estab-

---

**3.** Conrad further testified that he had never been in the service, had not applied for workmen's compensation, and was precluded from receiving welfare benefits due to his wife's income. His application for social security disability benefits was apparently denied without a hearing. Tr. 107–08.

lish the presence of a chronic respiratory or pulmonary disease which can be expected to lead to death or which lasted or may be expected to last continuously over at least a twelve month period, as demonstrated by specified values. 20 C.F.R. § 410.-490(b)(1)(i) and (ii).

■ Conrad has had three chest x-rays in the past. Neither the January 18, 1971 x-ray nor the January 10, 1975 x-ray showed any evidence of pneumoconiosis. The third, taken in May, 1974, and mentioned only in Dr. Olsen's August 21, 1974 report showed Plaintiff's lungs clear "except for a few small left lower lobe calcifications." No mention of pneumoconiosis is made in Dr. Olsen's discussion of this x-ray. These x-rays do not establish pneumoconiosis and Conrad has not had a biopsy. Therefore, the (i) requirement is not met. The Appeals Council's conclusion to this effect clearly draws sufficient support from the evidence to satisfy a substantial evidence standard.

■ The ALJ and the Appeals Council disagreed as to whether Conrad has satisfied the requirements in subparagraph (ii) of 20 C.F.R. § 410.490(b)(1). For a person of Conrad's height, 71 inches, the maximum permissible values are $FEV_1$ 2.6 and MVV 104. Two sets of pulmonary function studies are involved here. The 1975 tests, showing values exceeding interim standards, were submitted without the three spirometric tracings required by 20 C.F.R. § 410.430. Both the ALJ and the Appeals Council refused to consider these in determining Conrad's eligibility due to this deficiency. Tr. 79 & 83. The other set, taken in 1972, produced values before bronchodilation which were below the limits set by the interim adjudicatory rules. Even after bronchodilation the $FEV_1$ value barely ex-

ceeded permissible limits under the interim provisions, and the MVV value remained below the permissible maximum. See p. 845 supra. In addition, the report on this set of tests, while accompanied by the three requisite tracings, had no notation as to Plaintiff's degree of cooperation in the testing procedures as required by the regulations, 20 C.F.R. § 410.430. The ALJ, having examined a number of reports filed by Dr. Goldgier, the administering physician in the 1972 tests, noted

> that this doctor always leaves this comment off his reports. Were there to be any negative observation, it is felt that the doctor would have made such a comment in his report. Tracings are attached and substantiate the efforts in the testing.

ALJ's Decision, at 2; Tr. 83.[4] This conclusion may draw support from Plaintiff's testimony that he was not "trying to fake nothing" during either of the pulmonary function tests performed, although this testimony was not relied on by the ALJ in his determination. The ALJ found a presumption of total disability due to pneumoconiosis had arisen which had not been rebutted by any evidence to the contrary. He refused to consider the results of the 1975 pulmonary function tests, which produced values above the values established in the interim provisions, because they were submitted without tracings in violation of 20 C.F.R. § 410.430 and were taken after the June 30, 1973 expiration date of the interim adjudicatory rules.

The Appeal Council, however, found that the results of the 1972 pulmonary function studies could not be considered because of failure to comply with the requirements of the regulation, making no reference to the ALJ's finding that the administering physi-

4. While the ALJ placed no reliance upon it in his decision, his conclusion that the doctor would have made a negative comment if warranted could draw support from the "Examiner Check List for Review of PFS Report" used in evaluating pulmonary function studies as to their acceptability for claims adjudication.

Question 7 on the checklist asks, "Did the individual understand directions and cooperate in performing the test?" The Examiner is instructed to "Assume 'yes' if there are no indications to the contrary" in answering this question. Tr. 63.

cian always left the "cooperation" comment off his reports. A denial of benefits on this basis would rest upon an omission which may be the result of Dr. Goldgier's inadvertence or of a practice of leaving the cooperation comment blank where the patient's cooperation was satisfactory. The latter seems particularly likely in view of the ALJ's review of other reports by this physician and his finding that the doctor customarily fails to check an appropriate cooperation block on the report form. A remand would afford an opportunity to obtain Dr. Goldgier's testimony as to the significance of such an omission.

The Council also concluded that even if the results of the 1972 studies were considered, total disability would not be established because the pre-bronchodilation values "are questionable when viewed in light of the current ventilatory studies which show improvement rather than a worsening of the chronic and progressive pulmonary disease." *Appeals Council's Decision*, at 4; Tr. 79. But because the 1975 tests, submitted without spirometric tracings, were deemed unacceptable for claims adjudication by both the ALJ and the Appeals Council, their use by the Appeals Council to attack the validity of the 1972 test results seems problematical. If the Council is to rest its conclusion on test results indicating an improvement in a progressive disease, the reliability of those results should not also be in question. A remand would permit another set of pulmonary function tests to be administered and submitted with the requisite tracings, a statement as to degree of cooperation, and an evaluation of their suitability for claims adjudication.

Should the 1972 pulmonary function studies prove satisfactory for claims adjudication on remand, there would remain the issue of whether the pre-bronchodilation or post-bronchodilation values should be used to determine whether the rebuttable presumption of disability arises. The regulations do not speak to this issue directly. However, 20 C.F.R. § 410.430 states in part that, "if wheezing is present on auscultation of the chest, [ventilatory] studies must be performed following administration of nebulized bronchodilator. . . ." *Plaintiff's Brief* # 1, at 12 n.3. There is no indication of the presence of wheezing in the record unless it can be inferred from the mere administration of bronchodilators. In the absence of wheezing, the pre-bronchodilation values would appear to be the relevant results. In this case, they would give rise to a presumption which can be rebutted by either (1) "evidence that the individual is, in fact, doing his usual coal mine work or comparable and gainful work, (see § 410.412(a)(1)) or (2) [o]ther evidence, including physical performance tests (where such tests are available and their administration is not contraindicated), establish[ing] that the individual is able to do his usual coal mine work or comparable and gainful work." 20 C.F.R. § 410.490(3)(c)(1) and (2).

As Conrad is presently unemployed, the first test is inapplicable. Turning to "other evidence" under the second method of rebuttal, no physical performance tests are part of the record here. Considering the available evidence the Appeals Council concluded that:

> When viewed in light of the claimant's testimony that he operated a motor in the mines for 11 years and ceased coal mine employment when the mines shut down . . . the other relevant evidence as a whole does not demonstrate a level of severity as contemplated by the Act. The Council believes it would be highly unlikely for total disability to exist in such circumstances.

*Appeals Council Decision,* at 4; Tr. 79. The Council based its conclusion on the fact that Plaintiff's blood gas studies were normal and that he was not on daily medication, and on an extremely narrow reading of a statement by Dr. Olsen in the June 18, 1975 report. Dr. Olsen there stated:

> 4. The pulmonary distress that Mr. Conrad has to contend with has been a decided factor in his employability. Jobs with

daily lifting, climbing, extensive walking etc. would not have been in his best interests.

Tr. 126. The Council interpreted this to mean that "his pulmonary distress would *only* preclude jobs involving daily lifting, climbing and extensive walking." Tr. 79 (emphasis added). This reading may be challenged in view of another statement in paragraph (1) of the June 18th letter in which Dr. Olsen remarks that Conrad "has moderately severe pulmonary symptoms consisting of shortness of breath with *slightest* exertion . . . ." Tr. 126 (emphasis added).

On the other hand, the Council's position is strengthened by the nature of the mine work performed by Conrad. The record indicates he had two main jobs: Working on the tipple, which involved manipulating a lever, and operating a motor, an occupation which Conrad analogized to driving a streetcar. Both appear to demand minimal exertion. "Comparable and gainful employment" is defined under 20 C.F.R. § 410.-412(a)(1) as "engaging in gainful work in the immediate area of his residence requiring the skills and abilities comparable to those of any work in a mine or mines in which he previously engaged with some regularity and over a substantial period of time." To be prevented by his lung problems from engaging in such activity, Conrad would have to be virtually incapacitated. It is unknown whether such "comparable and gainful" employment is available in the immediate area of his residence, but if so, the nature of his mine work creates a particularly stringent standard for Conrad to meet to be entitled to benefits under the interim provisions. Because the Council concluded that the presumption did not arise, the existence of comparable and gainful employment in the immediate area of Conrad's residence was not explored. Should the presumption arise in light of the additional information gleaned on remand, the availability of such employment must be probed.

■ Plaintiff has also challenged the Appeals Council's failure to come to a specific holding on credibility if it disbelieved Conrad's uncontradicted testimony as to his cooperation in the two pulmonary function studies. The Council did not rely on a disbelief of Conrad's testimony and, indeed, made no specific mention of his testimony on this point in its decision. Moreover, a comparison of the case at bar to those in which an explicit holding on credibility has been demanded demonstrates basic differences between them. For example, in *Combs v. Weinberger,* 501 F.2d 1361 (4 Cir. 1974) (per curiam), the claimant sought social security disability benefits for three separate injuries. The ALJ held him disabled, but the Appeals Council denied the benefits, and the federal district court affirmed the denial. The Fourth Circuit, holding that the decision was not supported by substantial evidence, reversed on two grounds, only one of which is relevant here. The court objected to the inferences drawn by the Council as contrary to the claimant's testimony about his pain and disability:

> The Appeals Council may be entitled to disbelieve the claimant's testimony, even though uncontradicted in the record, but we think it must make a specific holding on the point when the hearing judge has found the claimant's testimony credible.

*Id.* at 1363. *See also Chester v. Mathews,* 403 F.Supp. 110 (D.Md.1975).

Cases like *Combs* are distinguishable from the instant case on several grounds. The fundamental distinction is that the Council's decision in the case at bar rests upon the medical examination report's failure to comply with the technical requirements in the regulations. Conrad's testimony cannot remedy those deficiencies. There is no indication in *Combs* or other cases where a specific credibility finding was demanded that there were any shortcomings in the claimant's compliance with statutory or regulatory provisions. *See, e. g., Chester v. Mathews, supra,* at 117–18. In addition,

in *Combs* the ALJ made a specific finding that Combs was "a sincere witness in his own behalf." 501 F.2d at 1362. In the instant case, the ALJ made no such finding, although he did mention Plaintiff's testimony as to his disability and the ALJ's own observation that Conrad "does not appear to be in the best of health or physical shape for his age." *ALJ's Decision,* at 1; Tr. 82. It is particularly noteworthy that the ALJ here made no mention of Plaintiff's testimony as to his cooperation in the examinations in question, and instead appears to place total reliance upon his finding as to Dr. Goldgier's practice of routinely omitting the "cooperation" comment from his reports. Furthermore, the Appeals Council, while never specifically commenting upon Conrad's credibility, did state that it had given "careful consideration to all relevant evidence . . . including . . . the testimony at the hearings." *Appeals Council Decision,* at 4; Tr. 79. Finally, at other points in its decision the Council took specific note of Plaintiff's testimony as to his symptoms and work experience. *Appeals Council Decision,* at 3–4; Tr. 78–79. Therefore, the Appeals Council did not totally ignore Conrad's testimony as it apparently did in *Combs. See* 501 F.2d at 1363. The rationale behind the disability benefit cases demanding a specific credibility finding has been to ensure that the claimant's subjective testimony has not been overlooked by the Secretary in his decision-making process. *Baerga v. Richardson,* 500 F.2d 309, 312 (3 Cir. 1974), *cert. denied* 420 U.S. 931, 95 S.Ct. 1133, 43 L.Ed.2d 403 (1975); *Smith v. Weinberger,* 394 F.Supp. 1002, 1007 (D.Md.1975). Here that rationale has been satisfied.

**B.** *Permanent Regulations*

■ A claimant may also seek to qualify for benefits under the permanent regulations, which provide several alternative means of establishing entitlement. *See* 20 C.F.R. § 410.490(e). If the claimant demonstrates the existence of complicated pneumoconiosis through a chest x-ray, biopsy or autopsy, an irrebuttable presumption of total disability due to pneumoconiosis arises under 20 C.F.R. § 410.418. Where, as here, a claimant fails to satisfy the requirements of that section, a determination of total disability due to pneumoconiosis may be made under the provisions of 20 C.F.R. § 410.422 on the basis of all the facts of the case. In making a finding of total disability under this section, the medical severity of the impairment is given primary consideration, but other factors such as the claimant's age, education and work experience are also significant. 20 C.F.R. § 410.422(c); *see* 20 C.F.R. §§ 410.424 and 410.426. Total disability under § 410.422 can only be found where the impairment is, or is presumed to be, pneumoconiosis. 20 C.F.R. § 410.422(b); *see* 20 C.F.R. § 410.414.

The general requirements for establishing pneumoconiosis are set forth in 20 C.F.R. § 410.414(a) through (c). Conrad does not satisfy the criteria in subparagraph (a) as his condition is not established by chest x-ray, biopsy or autopsy, as is required therein. Subparagraph (b) provides for a rebuttable presumption of total disability due to pneumoconiosis where a miner demonstrates the existence of a totally disabling chronic respiratory or pulmonary impairment. If this presumption is raised, it can be rebutted only by establishing that the miner does not have pneumoconiosis, or that his respiratory or pulmonary impairment did not arise out of or in connection with employment in a coal mine. 20 C.F.R. § 410.414(b)(2).

■ To prove that a chronic respiratory or pulmonary condition which is, or is presumed to be, pneumoconiosis is totally disabling, an individual must have either an impairment listed in the appendix to the regulations or the medical equivalent thereof (20 C.F.R. § 410.424), or he must satisfy the criteria in 20 C.F.R. § 410.426 (a) through (d). As Conrad has neither an impairment listed in the appendix nor its equivalent, he must attempt to prove a totally disabling impairment under the

§ 410.426 criteria. These require that the individual's impairment due to pneumoconiosis (or a condition presumed to be pneumoconiosis) be so severe that he is unable to do his previous coal mine work and, considering his age, education, and work experience, cannot engage in any other comparable and gainful work in the immediate area of his residence. 20 C.F.R. § 410.426(a); *see* 20 C.F.R. § 410.412(a)(1) (definition of comparable and gainful work). This may be shown by demonstrating pulmonary function study results equal to or below the $FEV_1$ and MVV values specified in subparagraph (b) of 20 C.F.R. § 410.426. Even if Conrad's test results were deemed acceptable for claims adjudication, his values on all studies exceed those specified, to wit: $FEV_1$ 1.8 liters and MVV 66 liters per minute.[5]

■ Where, as in the instant case, the results of his pulmonary function studies fail to establish the requisite disability under § 410.426(b), a claimant may still demonstrate entitlement by a physical performance test establishing a chronic respiratory or pulmonary impairment medically equivalent to the values required under that section (20 C.F.R. § 410.426(c)), or by other relevant evidence (as defined in 20 C.F.R. § 410.414(c)) establishing a miner's inability to engage in his mine work or in comparable and gainful work due to the severity of his chronic pulmonary or respiratory impairment. 20 C.F.R. § 410.426(d). *Tasker v. Califano,* Civil Action No. B–76–847, slip op. at 5–6 (D.Md., May 27, 1977); *Welsh v. Weinberger,* 407 F.Supp. 1043, 1046–47 (D.Md.1975). Because no physical performance tests were performed in Conrad's case, § 410.426(c) is inapplicable.

■ Under the provisions of 20 C.F.R. § 410.426(a) and (d), and the definition of comparable and gainful work in 20 C.F.R. § 410.412(a)(1), total disability due to pneumoconiosis may only be established when a claimant's pneumoconiosis renders him unable to engage in gainful work *available to him in the immediate area of his residence* requiring skills and abilities comparable to those of any work in a mine or mines in which he previously engaged with some regularity and over a substantial period of time.[6] In the instant case, no showing has been made as to the availability of such comparable and gainful work in the immediate area of Conrad's residence.

While no cases have been found on this point, the express language of the regulation demonstrates that, without such a showing, an integral part of the regulatory scheme is not satisfied. The Appeals Council has sought to deny Mr. Conrad's benefits by stating that his testimony as to his mining work experience, his normal results on blood gas studies and his apparent improvement in performance on the 1975 pulmonary function tests (which were unacceptable for claims adjudication due to the absence of tracings), as seen in light of the progressive nature of pneumoconiosis, make total disability "highly unlikely." Tr. 79. Such a conclusion assumes too much. While the minimal effort required to perform Conrad's mining jobs makes it extremely difficult for him to establish total disability under the § 410.426(d) test,[7] nevertheless, the determination of total disability, or lack thereof, hinges upon his inability due to the impairment to engage in comparable and gainful employment *in the immediate area of his residence.* The regulations demand a comparison of the skills and abilities used in the claimant's coal mining work with those required for jobs available to the claimant within a close proximity of his residence. Because the record is devoid of evidence as to the availa-

---

**5.** The absence of the "cooperation" comment and spirometric tracings also renders Conrad's two studies technically unusable under the permanent regulations.

**6.** The impairment, to be totally disabling, must also be expected to result in death or must have lasted or be expected to last for a continuous period of not less than one year. 20 C.F.R. § 410.412(a)(2).

**7.** *See* discussion under the interim adjudicatory rules, pp. 849–850 *supra.*

bility of jobs within the immediate area of the claimant's residence and the skills and abilities which such jobs require, there is no means of making the requisite comparison.[8] On remand such evidence must be taken. Should comparable and gainful employment be found to exist in the immediate environs of Conrad's home, the Secretary must then evaluate his present physical capabilities to determine whether his impairment renders him unable to meet the demands of such employment. However, if the evidence demonstrates that none is available, benefits cannot be denied on the basis that Conrad is *theoretically capable* of performing such work.

By definition, Conrad would be unable to engage in comparable and gainful employment if none exists within the pertinent geographical locale. It may be argued that this inability is not due to the claimant's impairment, but rather is a product of the economic conditions in his particular residential area. Were this argument accepted, a claimant who is totally incapacitated could be denied benefits *under this test* merely because comparable and gainful work is not available. This could not have been the drafter's intention in that it ignores the purpose of restricting the inquiry

to the immediate area of the claimant's residence. This limitation mandates that evidence be gathered as to the realities of the labor market within the claimant's community. The claimant's occupational potential is obviously circumscribed by his impairment. If his right to benefits could be so easily circumvented, this limitation would become meaningless and its purpose defeated. Each element of the standard incorporated into § 410.426(d) must be satisfied, and any denial of benefits to be justified must be based upon claimant's *ability to engage* in comparable and gainful work.

The requirements for establishing total disability under § 410.426(d) would, therefore, be satisfied if no such employment was available to the claimant within the prescribed area. In addition, because the existence of a totally disabling chronic respiratory or pulmonary impairment would be established by such a determination, Conrad would be entitled to the benefit of the § 410.414(b)(1) rebuttable presumption of total disability due to pneumoconiosis, a presumption which could only be rebutted by showing that the impairment was not pneumoconiosis or that it did not arise out of or in connection with employment in a coal mine. Absent such rebuttal, Conrad

---

8. This area of inquiry may be analogized to the pre-1967 amendment cases under Social Security's disability benefit provisions, 42 U.S.C. §§ 416(i) & 423. For example, in *Cyrus v. Celebrezze,* 341 F.2d 192 (4 Cir. 1965), the Fourth Circuit stated: "An even more serious defect in the Secretary's findings, however, is the total absence of proof that jobs exist in the local economy which Cyrus, with his handicap, is capable of performing . . . . The record is barren of evidence to show that [the vocational counselor] actually checked to determine whether the jobs he cited were available in the vicinity of Cyrus' home." *Id.* at 196. Similarly, in *Hall v. Celebrezze,* 347 F.2d 937 (4 Cir. 1965), the court held that a denial of disability benefits on the basis of an ability to engage in substantial gainful activity other than the claimant's former employment must be supported by findings both as to the particular work which the claimant is still capable of performing and the availability of such jobs to him in or near his residential area. *Id.* at 938. The court in *Wimmer v. Celebrezze,* 355 F.2d

289 (4 Cir. 1966) concluded that "neither the provisions of the statute relating to a claimant's impairments nor those relating to the availability of employment may be applied in a vacuum but must instead be considered in the factual context of each case." *Id.* at 293. In the pre-1967 amendment cases, the issue was the availability of substantial gainful activity within a reasonably accessible labor market. *See Wimmer v. Celebrezze, supra; Celebrezze v. Kelly,* 331 F.2d 981, 982 (5 Cir. 1964). The geographical parameters of that labor market were controlled by the facts of each case, consideration being given to factors such as the age, education and experience of the claimant, the nature and extent of his occupational skills, his present physical capacity, the availability of public transportation, and access to an adequate road system. *See, e. g., Boyd v. Gardner,* 377 F.2d 718 (4 Cir. 1967). With the advent of the 1967 amendments to 42 U.S.C. § 423, the relevant geographical area for disability cases became the national economy.

would be entitled to benefits under the Federal Coal Mine Health and Safety Act.

## C. *Remand*

As demonstrated above, there are ambiguities and gaps in the present record which may affect the final outcome of Mr. Conrad's claim and which should therefore be clarified and filled. The case will be remanded for this purpose. On remand the testimony of Dr. Goldgier should be taken with respect to his omission of a cooperation comment from his report on Mr. Conrad's ventilatory studies, and on pulmonary function examinations generally, and the significance of such an omission. In addition, the availability of comparable and gainful activity in the immediate area of Mr. Conrad's residence should be explored both as to the permanent regulations and, if the 1972 test results are found to give rise to a rebuttable presumption of total disability due to pneumoconiosis in view of Dr. Goldgier's testimony, as to the interim rules.

Finally, the Plaintiff should be given another pulmonary function examination, the results to be accompanied by the requisite spirometric tracings, a comment as to the degree of patient cooperation and an evaluation of the results by a qualified physician. This will provide a reliable gauge of the Plaintiff's present health and of the validity of the 1972 test results considered in light of the chronic, progressive nature of pneumoconiosis.

For the reasons hereinabove stated, it is this 15th day of July, 1977, by the United States District Court for the District of Maryland, ORDERED:

1. That the Plaintiff's motion for remand is hereby GRANTED;

2. That the Plaintiff's motion for summary judgment is hereby DENIED;

3. That the Defendant's motion for summary judgment hereby DENIED; and

4. That the Clerk mail copies of this Memorandum Opinion and Order to James

J. Lyko, Esquire, attorney for Plaintiff, and to John W. Sheldon, Esquire, Assistant United States Attorney for the District of Maryland.